In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-2502

STEVE CARLISLE, JOHN BUSZKIEWICZ, and
TEAM EXCAVATING, INC., individually and
d/b/a Klear Kut Excavating, and d/b/a Klear
Kut Excavating, Inc.,

*Plaintiffs-Appellants,*

*v.*

DEERE & COMPANY, d/b/a
Deere Power Systems Group,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 06 CV 00710—**James T. Moody**, *Judge.*

ARGUED MAY 4, 2009—DECIDED AUGUST 7, 2009

Before KANNE and EVANS, *Circuit Judges*, and DOW,
*District Judge.*\*

---

\* Honorable Robert M. Dow, Jr., United States District Judge for
the Northern District of Illinois, is sitting by designation.

KANNE, *Circuit Judge*.    The Beast, manufactured by Bandit Industries, Inc., is a commercial-grade tree grinder that weighs approximately 60,000 pounds and is the size of a semi-trailer. The Beast feeds on logs up to thirty-six inches in diameter, reducing them to mulch at a rate of up to one acre's clearance per day. In 2002, the plaintiffs, Steve Carlisle and John Buszkiewicz, purchased a Beast, equipped with a 12.5-liter John Deere engine, for use in their landscaping and excavating business. Carlisle and Buszkiewicz soon discovered, however, that their Beast lacked the muscle befitting its name. The machine failed to perform as advertised, and the two men sued John Deere, seeking payment under the terms of an engine warranty. The district court granted summary judgment in Deere's favor, a decision that we now affirm.

## I. BACKGROUND

The Beast in this case was manufactured in 1999 and purchased by a third party, Kramer Tree Specialists. At its birth, the Beast contained a different engine than the one in the present dispute. In May 2000, Kramer Tree replaced the Beast's original engine with an engine manufactured by Deere; sold to a distributor, Superior Diesel; and installed in the Beast by West Side Tractor. Kramer Tree felt that the Beast underperformed with the new engine and later traded it to Vermeer Midwest, an industrial equipment supplier.

Enter Carlisle and Buszkiewicz. Together, the two men operated an excavating business under a variety of titles and organizational structures, including Klear Kut Mills,

Inc.; Klear Kut Excavating, Inc.; and Team Excavating, Inc.[1] In June 2002, they purchased the Beast from Vermeer for $125,000, intending to grind the trees and brush they cleared in their business operations and sell the resulting mulch for profit.

According to Carlisle and Buszkiewicz, the Beast underperformed from the outset. They complained that the engine lacked power, ran rough, overheated, and bogged down under a load. They were forced to operate the machine much slower than they expected, and jobs that the men thought would take weeks took months. As a result of the Beast's poor bite, the duo claims to have suffered significant financial loss.

In hopes of improving the Beast's performance, Carlisle and Buszkiewicz, acting over a period of years, sought technical support from several industrial equipment companies, including Bandit, Vermeer, and West Side Tractor. In late 2004 or early 2005, Buszkiewicz spoke on the telephone with an employee at Superior Diesel, the engine distributor that had sold the Beast's replacement engine in 2000. The Superior Diesel employee instructed Buszkiewicz to inspect the Performance Programming Connector, or PPC, located in the Beast's control panel.

The PPC, which Deere also manufactures but sells separately from its engines, is the Beast's brain. The way

---

[1] Notwithstanding the use of "Inc." in their respective titles, it appears that Klear Kut Mills, Inc. and Klear Kut Excavating, Inc. were never incorporated under the laws of any state. According to Carlisle, however, Team Excavating was incorporated in the state of Indiana.

the PPC is wired dictates the engine's performance by regulating both the engine's horsepower and its rotations per minute. A PPC is configured by inserting or omitting wires, as appropriate, into a ten-pin connection board that features five adjacent terminal pairs, arranged roughly as follows:

| A | K |
|---|---|
| B | J |
| C | H |
| D | G |
| E | F |

Wires in the A-K and B-J terminal pairs determine the engine's horsepower. Similarly, and importantly for this case, the presence or absence of a wire in the E-F terminal pair determines the engine's maximum rotations per minute. If a wire is installed in the E-F terminal pair, the engine activates its isochronous governor, which limits the engine to 2,100 rotations per minute. Without a wire in the E-F terminal pair, the engine is allowed to exceed 2,100 rotations per minute.

Upon investigating the Beast's PPC, Buszkiewicz discovered that a wire was installed in the E-F terminal pair. At Superior Diesel's instruction, Buszkiewicz cut the wire. The effect, according to Carlisle and Buszkiewicz,

was immediate. The Beast roared to life. Carlisle stated in a deposition that the engine sounded "meaner," and Buszkiewicz said that they knew they "had a total [sic] different machine." This discovery led the men to believe that the engine, as originally wired, had been defective. They now claim that Deere's inability to identify and correct this defect was a breach of the engine's warranty.

When Carlisle and Buszkiewicz purchased the Beast in 2002, they also inherited the remainder of an extended warranty on the engine, issued by Deere and originally purchased by Kramer Tree in September 2001. The warranty covered certain engine components until September 7, 2003, or 5,000 hours of use, whichever came first. When Carlisle and Buszkiewicz[2] assumed the warranty on June 2, 2002, the Beast registered 2,010 hours of use, meaning that the warranty extended for approximately another 3,000 hours or another fifteen months from the date of purchase.

The warranty, which applied "to the engine and to components and accessories sold by John Deere which bear its name," pledged that "[a]ll parts of a new John Deere engine which is subject to this Extended Warranty,

---

[2] The warranty was actually transferred from Kramer Tree to Klear Kut Mills, Inc. As one theory on appeal, Deere argues that Klear Kut, having never been incorporated under the law, was a de facto partnership and, as such, the real party in interest to bring this lawsuit, not Carlisle and Buszkiewicz as individuals. *See* Fed. R. Civ. P. 17(a)(1). Because we decide the case on other grounds, we need not reach this argument.

and which, as delivered to the original retail purchaser, are defective in materials or workmanship, will be repaired or replaced, as John Deere elects, without charge." The warranty contained numerous exceptions to its coverage, including "components or accessories which are not furnished or installed by John Deere" and "[c]onsequences of . . . improper application, installation, or storage of the engine."

On September 5, 2005, the two men, both citizens of Indiana, filed in the circuit court of LaPorte County, Indiana, a one-count complaint against Deere, a corporation registered in Delaware with its principal place of business in Illinois, alleging breach of warranty. Deere removed the case to the Northern District of Indiana, where it filed a motion for summary judgment. In an order dated May 22, 2008, the district court granted summary judgment in Deere's favor. It is this decision that Carlisle and Buszkiewicz now appeal.

## II. ANALYSIS

We review *de novo* the district court's decision to grant summary judgment. *See Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). Summary judgment in Deere's favor is appropriate if, after reviewing the record as a whole and drawing all reasonable inferences in favor of Carlisle and Buszkiewicz, there remains no genuine issue as to any material fact. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if, on the evidence provided, no reasonable juror could return a verdict in favor of Carlisle and Buszkiewicz,

summary judgment against them is warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When a case is removed from state court based on the parties' diverse citizenship, the forum state's choice-of-law rules determine the applicable substantive law. *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co.*, 544 F.3d 752, 759 (7th Cir. 2008). As such, we apply Indiana law to the present dispute. *See NUCOR Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 581 (7th Cir. 1994) (noting that Indiana courts apply the "most intimate contacts" or "most significant relationship" test to determine applicable law in contract disputes).

Although the parties present a variety of arguments on appeal, the decisive issue in this case is whether the complaints lodged by Carlisle and Buszkiewicz fall within the terms of Deere's express warranty.[3] The portion of Indiana's Uniform Commercial Code that deals with express warranties reads: "[A]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods . . . creates an express warranty that

---

[3] Although the plaintiffs raised no such argument, the district court gave plaintiffs "the benefit of the doubt" and considered whether, in addition to breaching an express warranty, Deere had breached an implied warranty. Such benefit of the doubt is no longer necessary. In their briefs to this court, Carlisle and Buszkiewicz expressly deny making any implied warranty claims; instead, they rest their arguments solely on Deere's purported breach of its express warranty. We cabin our discussion accordingly and consider only the scope of Deere's written warranty.

the goods shall conform to the affirmation or promise." Ind. Code § 26-1-2-313(1)(a). We conclude that because Deere cannot breach a promise that it did not make, summary judgment in its favor was appropriate.[4]

The written warranty covers "defective workmanship" performed by Deere. It excludes, however, "components or accessories which are not . . . installed by John Deere" and states that the purchaser is responsible for the consequences of "improper application [or] installation." Reading these provisions and ignoring for a moment other issues such as defectiveness and timeliness, we see three potential outcomes. First, if the wiring resulted from Deere's workmanship, the warranty covers the plaintiffs' claim. Second, if the wiring was an example

---

[4] Notwithstanding our agreement with the district court's outcome, we part ways in the rationale that we use to arrive at our conclusion. *See Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) (noting that an appellate court may affirm a judgment "on any ground supported by the record, even if different from the grounds relied upon by the district court"); *see also Rubel v. Pfizer, Inc.*, 361 F.3d 1016, 1020 (7th Cir. 2004) ("Appellate courts review judgments, not opinions."). The district court dispatched the plaintiffs' arguments relative to the express warranty after finding that Deere's warranty covered only the engine, of which the PPC was not a part. On appeal, however, Deere concedes that the district court was mistaken: the PPC *is* a part of the engine, a concession we believe wise in light of the warranty's stated application "to the engine *and to components and accessories sold by John Deere*" (emphasis added). This revelation does nothing to alter our analysis.

of installation and Deere itself performed that installation, the warranty covers the plaintiffs' claim. Finally, if the wiring was the result of third-party installation, the plaintiffs' claim falls outside the warranty. Again, these are broad conclusions to the gateway question of whether the plaintiffs' claim falls within the scope of Deere's warranty. Only if Carlisle and Buszkiewicz pass through this gateway need we consider Deere's other challenges to their claim, such as whether the PPC's wiring was truly defective or whether the plaintiffs made their claim within the time contemplated by the warranty.

### A. Was the PPC's wiring the result of Deere's "workmanship"?

The warranty covers Deere engines and components that are "defective in . . . workmanship." But we see no way to interpret "workmanship" to include the PPC's wiring. Grant Suhre, who is employed by Deere as a manager of its field service, stated in an affidavit that PPCs, which Deere sells and ships separately from its engines, leave the Deere manufacturing plant "unconfigured," i.e., without wiring in the terminal pairs that would dictate a particular engine's ultimate use. The reason is obvious. Deere's engines (and, derivatively, its PPCs) may be used in any number of applications. Deere does not know a purchaser's intended use for one of its engines and therefore leaves the configuration to others. Deere's final product, as it leaves the company's hands, is an unconfigured, unwired PPC. This unconfigured PPC is the end result of, and the conclusion to, Deere's "work-

manship." If there were some defect in *that* product, Deere would likely be liable under the warranty. What happens after a PPC leaves Deere's plant, however, can only be called "installation."

In an attempt to characterize the PPC's wiring as the product of Deere's "workmanship," Carlisle and Buszkiewicz cite two cases that deal with that term's meaning under Indiana law. *See J.M. Foster, Inc. v. Spriggs*, 789 N.E.2d 526 (Ind. Ct. App. 2003); *Schultz v. Erie Ins. Group*, 754 N.E.2d 971 (Ind. Ct. App. 2001). In *J.M. Foster, Inc.*, the court stated that "'workmanship' encompasses not only the quality of the finished product, but the manner of construction as determined by the art, skill, or technique of the worker." 789 N.E.2d at 533. The *Schultz* court stated that "workmanship" embraces "both 'process' and 'product.'" 754 N.E.2d at 976. We have no quarrel with these definitions. Note, however, that both are tied to a "product." Deere's product, as we just discussed, is an unconfigured PPC, and against that product the plaintiffs have lodged no complaints.

The plaintiffs' arguments highlight an important caveat that the Indiana appellate court discussed in *Schultz*: context matters. *See id.* ("[T]o a great extent, the context of the policy gives meaning to the individual terms."). As one's perspective changes, so does the meaning of terms such as "workmanship" and "installation." Consider, for example, the placement of a battery into vehicle. To the battery's manufacturer, its "workmanship" occurs during the process of creating the battery itself. From that manufacturer's perspective, "installation" would be the

process of placing that battery into a particular vehicle, generally performed by a mechanic. To the mechanic, however, his "workmanship" *is* the act of "installation." Thus, the same act can be two different things to two different people or entities, "installation" to one and "workmanship" to another.

Applying our analogy to this case, Deere manufacturers the batteries. It does not install them in the cars. From Deere's perspective, the act of wiring the PPC was installation, not workmanship. As such, the first of our potential outcomes fails.

### B. The PPC's wiring was "installed," but by whom?

Having decided that the PPC's wiring was the result of installation, not workmanship, we must next ascertain who was responsible for that installation. More precisely, we must determine whether there is evidence in the record to suggest that Deere itself installed the PPC's wiring. The warranty places on the purchaser the onus of correcting problems that originate from improper installation that was not performed by Deere, thereby providing no protection for errors made by others down the engine's supply chain. Carlisle and Buszkiewicz argue that Deere installed the PPC's wiring, a contention with which Deere disagrees. In support, each party points to evidence in the record; but as we will see, only Deere's evidence is admissible, making our decision on this issue clear.

1. *The Plaintiff's Evidence: Were West Side Tractor's
   statements inadmissible hearsay?*

To bolster their contention that Deere installed the
PPC's wiring, Carlisle and Buszkiewicz refer us to para-
graph forty-six of their Statement of Material Facts in
Genuine Dispute, which reads: "West Side Tractor told
the Plaintiffs that John Deere came to West Side and set
the wiring on the Performance Programming Connector
at the time the engine was installed on The Beast." The
paragraph cites portions of Steve Carlisle's deposition.
According to Carlisle, West Side Tractor told him in a
phone conversation that "John Deere's own people came
out, screwed with it, so . . . on and so on." West Side
Tractor told Carlisle, "[W]e didn't screw it up. John
Deere came down. They did this." Carlisle stated that
West Side Tractor advised him that "the people from
John Deere were messing with the torque curve wires."

Unfortunately for Carlisle and Buszkiewicz, however, to
defeat Deere's motion for summary judgment, they may
rely only on admissible evidence. *See Lewis v. CITGO
Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009); *Schindler
v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). If, as here,
evidence is inadmissible hearsay, we may not consider
it. *See, e.g.*, *Schindler*, 474 F.3d at 1012.

The Federal Rules of Evidence prohibit the admission of
hearsay, *see* Fed. R. Evid. 802, which is "a statement, other
than one made by the declarant while testifying at the
trial or hearing, offered in evidence to prove the truth of
the matter asserted," *id.* 801(c). On first blush, West Side
Tractor's statements to Carlisle appear to fall squarely

within that definition. West Side Tractor did not provide these statements, meaning that we must rely only on Carlisle's recitation. That, coupled with the fact that Carlisle and Buszkiewicz present these statements for their truth—that Deere did in fact install the wiring in the PPC—implicates the evidentiary rules against hearsay. Unless an exception applies or the statements are "nonhearsay," we may not consider them in our analysis.

The evidentiary rules contain a laundry list of exceptions to the general prohibition on the admission of hearsay statements, *see id.* 803, 804, 807, as well as a category of statements commonly known as "nonhearsay," which are also admissible, *see id.* 801(d). Carlisle and Buszkiewicz characterize West Side Tractor's statements as the latter.

Rule 801(d) classifies a statement as nonhearsay if the statement is offered against a particular party and (1) is made by a person "authorized by [that] party to make a statement concerning the subject," or (2) is made by that party's agent "concerning a matter within the scope of the agency." *Id.* 801(d)(2)(C)-(D). Carlisle and Buszkiewicz argue that West Side Tractor's statements are nonhearsay under either provision. The district court decided the case on other grounds and never reached the hearsay question, making ours the first court to consider the issue.

We turn first to Rule 801(d)(2)(C), under which West Side Tractor's statements would be nonhearsay if Deere had authorized the company to make them. Exactly the

opposite has happened here. Paragraph F of the warranty removes from West Side Tractor any authority to make statements concerning the warranty. It states: "Neither original equipment manufacturers, engine or equipment distributors, engine or equipment dealers, nor any other person or entity, has any authority to make any representation or promise on behalf of John Deere . . . ." With this written limitation on West Side Tractor's authority to speak on Deere's behalf, Rule 801(d)(2)(C) is inapplicable.

Next, we consider whether West Side Tractor was an agent of Deere, as required for its statement to be nonhearsay under Rule 801(d)(2)(D). As a general rule, a dealer is not an agent for manufacturers of the products it sells. *See Bushendorf v. Freightliner Corp.*, 13 F.3d 1024, 1026 (7th Cir. 1993). Labels such as "dealer" are not determinative, however, *cf. Dutton v. Int'l Harvester Co.*, 504 N.E.2d 313, 317 n.2 (Ind. Ct. App. 1987) ("[T]he mere express denial of the existence of an agency relationship is not in itself determinative of the matter."), and it is not hard to imagine circumstances whereby a dealer could be a manufacturer's agent, *see, e.g.*, *Thompson Farms, Inc. v. Corno Feed Prods.*, 366 N.E.2d 3, 10-12 (Ind. Ct. App. 1977) (discussing in detail the circumstances leading to its conclusion that an implied agency existed between a dealer and a principal).

Under Indiana law, an agency exists if the principal manifests consent to the agency, the agent acquiesces, and the principal exerts control over the agent. *See Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1333 (7th Cir. 1995). The

principal's control over the purported agent's day-to-day operations is of paramount importance. *Id.* Day-to-day operations could include such things as personnel decisions, bookkeeping and financial matters, and buying and selling inventory and supplies. *See id.* at 1333-34; *cf. Salingue v. Overturf*, 647 N.E.2d 1068, 1104 (Ill. App. Ct. 1995) (noting that the existence of an agency relationship "depends on a number of facts, including the manner of hiring, the right to discharge, the manner and direction of the work of the parties, the right to terminate the relationship, and the character of the supervision of the work done"). It is uncontested that Deere did not exert such overarching control over West Side Tractor.

Instead, Carlisle and Buszkiewicz advance a narrower argument, contending that West Side Tractor was Deere's agent only "for purposes of claims made under the extended warranty." They direct us to Paragraph B of the warranty, which contains instructions for both the purchaser seeking service under the warranty and to the authorized Deere service outlets providing such service. Specifically, Paragraph B informs Deere's service providers (1) that they are to use only new or remanufactured parts, and (2) that Deere will reimburse up to $300 in the service providers' travel expenses. This language, however, is insufficient to establish an agency relationship, even on a more limited basis.

We conclude that West Side Tractor's out-of-court statements fail to satisfy any of the nonhearsay definitions contained in Rule 801(d)(2) and, accordingly, constitute inadmissible hearsay. We refuse to consider them

further and turn now to Deere's evidence regarding whether it installed the wiring in the PPC.

   2.  *The Defendant's Evidence: Deere did not install the PPC's wiring.*

Deere has presented substantial admissible evidence that it did not wire the Beast's PPC. We return to the affidavit filed by Grant Suhre, a Deere manager. Speaking generally, Suhre said that Deere "does not configure or wire the PPC of a control wiring harness sold to an engine distributor." He continued, "Deere is not involved in the manufacturer's determination, or decision-process, regarding the proper setting of the PPC for that manufacturer's equipment. As such, Deere would not change the PPC wiring configuration selected by the manufacturer of the equipment in which an engine is installed as a component part." Turning to the particular engine and PPC now before us, Suhre stated that "[t]here is nothing in Deere's records to show that Deere installed [or configured] the PPC or Engine in the [Beast]."

Suhre also suggested that Bandit Industries, not Deere, installed the PPC. He said that the Beast's 2000 engine replacement—resulting in the installation of the current engine—did not require replacement of the Beast's original PPC, which the Beast's manufacturer, Bandit Industries, had installed when the Beast was built in 1999. Said Suhre: "Installation of the Engine into the [Beast] in 2000 should not have required anyone to touch or replace the original PPC installed with the [Beast's] first engine since the engine is installed in, and connected to, the [Beast]

independent of the PPC." Thus, the only admissible evidence in the record supports Deere's claim that it did not install the wiring in the PPC.

### III. CONCLUSION

We conclude that the Performance Programming Connector's wiring was not the result of Deere's workmanship or installation. As such, the wiring was not included under the terms of the warranty. We cannot hold Deere liable for breaching a promise it never made. *See* Ind. Code § 26-1-2-313(1)(a). Because Deere's warranty did not cover a third-party's wiring of the PPC, we AFFIRM the district court's order granting summary judgment in Deere's favor.