In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1711

JEREMY D. CAIREL AND MARVIN JOHNSON,

*Plaintiffs-Appellants*,

*v.*

JACOB ALDERDEN, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 1878 — **John F. Grady**, *Judge*.

ARGUED MAY 27, 2015 — DECIDED MAY 5, 2016

Before POSNER, MANION, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal presents several issues concerning the scope of civil remedies available to people who are mistakenly arrested and charged with crimes. In 2007, plaintiffs Jeremy Cairel and Marvin Johnson were helping a friend repossess cars lawfully when they were stopped for a traffic violation. The officers conducting the stop, aware of a recent string of robberies in the area, grew suspicious and called a robbery victim to the scene. The victim identified

Cairel and Johnson as the men who had robbed him the night before. The officers arrested them on the spot. When questioned later by detectives, Cairel eventually confessed to several robberies and implicated Johnson in one.

Prosecutors filed charges against both Cairel and Johnson. Johnson pled guilty in exchange for probation. Further investigation, however, revealed that both Cairel and Johnson were actually innocent. Over a year after the arrests, prosecutors dismissed Cairel's case and allowed Johnson to withdraw his guilty plea. Neither Cairel nor Johnson was imprisoned; Cairel was never convicted.

Plaintiffs Cairel and Johnson sued the defendant detectives under 42 U.S.C. § 1983 alleging three federal due process claims: fabricating Johnson's confession, failing to disclose a potential alibi witness, and coercing Cairel's confession. Plaintiffs also alleged state-law claims for malicious prosecution and intentional infliction of emotional distress. The district court granted summary judgment for defendants, and plaintiffs appealed.

We affirm. First, summary judgment was properly granted on plaintiffs' federal due process claims. Plaintiffs' fabrication claim is foreclosed because they were not deprived of sufficient liberty to support their claim. Plaintiffs' suppression claim fails because they have no evidence that defendants concealed evidence unknown to plaintiffs supporting their alibi or that any failure to disclose caused a deprivation of liberty. Cairel's substantive due process claim for coercion fails because no reasonable jury could find that his interrogation "shocked the conscience." Plaintiffs' state-law claims also fail. Probable cause for the criminal charges defeats the claims for malicious prosecution, and no reasonable jury could find

that defendants' conduct was so "extreme and outrageous" as to prove intentional infliction of emotional distress.

I.  *Facts for Summary Judgment*

   A.  *The Traffic Stop*

This suit arises out of the arrest and subsequent treatment of the two plaintiffs in this case, Jeremy Cairel and Marvin Johnson. In 2006, both spent some time repossessing cars for a friend, Eric Moore, who worked for a car repossession company. Neither plaintiff was actually employed by the company. They helped Moore informally in return for cash.

Plaintiffs were arrested on the evening of January 24, 2007, when they and Moore were out repossessing cars. Two police officers stopped plaintiffs' car after seeing several traffic violations. Johnson told the officers that they were in the area to repossess cars. Moore provided the officers with paperwork showing that they were doing legitimate repossessions.

   B.  *Evidence Supporting Probable Cause*

The incident might not have aroused the officers' suspicions, but they knew that in the weeks before the traffic stop, the area had seen a string of robberies in which robbers had impersonated police officers, pulled over cars, and robbed the occupants. Just the night before the plaintiffs were stopped, Joseph Micetich had been robbed in this way.

The police asked Micetich to come to the scene of plaintiffs' traffic stop. Defendants contend that, upon arriving, Micetich identified Cairel and Johnson as the men who robbed him. Plaintiffs offer evidence that Moore overheard Micetich express uncertainty and that Micetich never actually affirmatively identified plaintiffs at the scene. We assume that

Moore's account is true, but it is also undisputed that Micetich later told police he was confident in his identification. Even years later he said he was still "absolutely sure that Jeremy Cairel and Marvin Johnson are the men who robbed me." Following this disputed identification, the police arrested Cairel and Johnson and took them back to the station.

At that point, Detectives Jacob Alderden and Patrick Johnson—both defendants in this case—became involved. First, the detectives spoke with the arresting officers and then with Micetich, who confirmed his identification of Cairel and Johnson as the men who robbed him. This time, Micetich said he was absolutely sure of his identifications. Second, the detectives compared Micetich's descriptions of the robbers from the night before to Cairel and Johnson. There were discrepancies. Micetich, who viewed the robbers from his car while being robbed, had previously described the robbers as a black man who was five feet, six inches tall and a Hispanic man who was six feet tall. Johnson is black and five feet, eight inches tall, while Cairel is white and six feet, five inches tall. The detectives did not think these discrepancies were particularly great, especially given Micetich's certainty and the fact that the initial observation occurred at night.

The detectives then questioned Cairel. He appeared upset throughout the interrogation. Although Cairel initially denied having committed the robbery and later turned out to be innocent, he eventually told the detectives that he, Moore, and Johnson had actually robbed several people, including a man who might have been Micetich.

To support their claims that the detectives took unfair advantage of Cairel, plaintiffs emphasize that Cairel had been diagnosed with an unspecified learning disability and had

low IQ scores consistent with that diagnosis. A psychological examination suggested that Cairel's disability could cause him to agree mistakenly with someone else's statements. The detectives have produced expert testimony suggesting that they would not have been able to tell that Cairel lacked the ability to comprehend the content and consequences of his confession simply from talking to him. Plaintiffs have offered evidence that Moore told the detectives that Cairel had been in special education classes and had a learning disability.

The detectives then confronted Johnson with what Cairel had said. Plaintiffs and defendants disagree about the events that followed. According to defendants, Johnson corroborated Cairel's confession. Johnson denies that he ever confessed to the robberies. (He would later plead guilty in exchange for probation.) For purposes of summary judgment, we must assume that Johnson's confession was fabricated by the detectives.

Finally, Detective Alderden interviewed Moore. Moore denied committing any robberies and provided an alibi for the Micetich robbery. He made it clear that he, Cairel, and Johnson had been transporting cars elsewhere. Other detectives, including Luis Otero, who is also a defendant in this case, visited the repossession company the next day. The detectives confirmed that Moore worked for the company and had repossessed cars on the day of the Micetich robbery. The alibi was not airtight, though. Nothing in the records confirmed the exact times when plaintiffs were repossessing the cars that day.

The detectives then brought in Elias Arias, who had also been robbed by men impersonating police officers. He identi-

fied Cairel in a line-up as one of the robbers. Arias's initial description had suggested that he was robbed by one white male who was in his forties and was five feet, two inches tall, and another white male who was between five feet, eight inches and ten inches tall. Even though these also differed considerably from Cairel, in Detective Alderden's view these discrepancies did not exclude Cairel because witness estimates of height and age are often imprecise and because Arias seemed confident about his identification in the line-up.

## C. *Plaintiffs Are Charged*

At that point, Detective Alderden felt he had enough to take Cairel's case to Assistant State's Attorney Elizabeth Ciaccia. Cairel maintains that the detective told him that if he helped out Ciaccia, he would be able to go home. Ciaccia initially met with Cairel alone and asked him if he had been treated well. Cairel said that he had been, and he confirmed that he had not been threatened or promised anything. Cairel told the prosecutor about the Arias and Micetich robberies. The prosecutor then put Cairel's confession in writing, reading aloud each page while Cairel made changes as she went along. Cairel said that he and Johnson had robbed Micetich and that he and Moore had robbed Arias. Cairel admits that he signed the documents and agreed to them at the time they were written, but now it is clear that none of it was actually correct. The prosecutor then interviewed Johnson, but he did not admit to her any criminal activity.

Cairel was charged with armed robbery for the Arias robbery, aggravated robbery for the Micetich robbery, and two counts of aggravated false "personation" of a peace officer. See 720 ILCS 5/32-5.2 (2007). Johnson was charged with ag-

gravated robbery of Micetich and aggravated false "personation" of a peace officer. Moore was not charged. Johnson and Cairel were released from Cook County Jail after a few days in police custody when their families posted bond.

D. *The Cases Collapse*

Over the next several months, however, the cases against Cairel and Johnson weakened and eventually collapsed. Detective Alderden did not assume the cases were closed. He took another look at the repossession orders and found that some of the people Cairel claimed he had robbed had actually had their cars repossessed lawfully. Detective Alderden made sure to document these discrepancies in a report on April 14, 2007, which he passed on to the prosecutor handling the criminal cases.

The second development that shook Detective Alderden's confidence that Cairel was involved in robberies was that another man, Joseph Hatzell, was later arrested for a similar "police impersonation job." When Hatzell was brought in for questioning, he said he was fairly certain that Arias was one of the people he had robbed. Detective Alderden also brought this to the attention of the prosecutors.

The State dropped the charges against Cairel in March 2008, over a year after the initial arrest. Cairel's lawyer also convinced the prosecutors to allow Johnson to vacate his guilty plea—he had pled guilty so that he could avoid jail time—after he had served one month of probation.

Plaintiffs then filed suit in federal court against Detectives Alderden and Johnson, the City of Chicago, and several other defendants, most of whom have since been dismissed from

the case. Plaintiffs alleged federal due process violations, con-spiracy to violate constitutional rights, and state law claims for malicious prosecution and intentional infliction of emo-tional distress. Defendants eventually moved for summary judgment on all of plaintiffs' claims, and the district court granted the motion across the board.

II. *Standard of Review*

We review *de novo* a district court's decision to grant a mo-tion for summary judgment. *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014). We review all evidence in the light most favorable to the non-moving parties—here, the plaintiffs—and give them the benefit of all reasonable inferences from the evidence in their favor. *Id.*, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropri-ate when no genuine dispute of material fact exists and the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

Before we address the merits of plaintiffs' claims, we first address their contention that the district court should not have considered the defendants' police reports—including defendants' own observations and those of eyewitnesses to the robberies—on summary judgment. To be considered on summary judgment, evidence must be admissible at trial, though "the form produced at summary judgment need not be admissible." *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010). If the evidence is inadmissible hearsay, the courts may not consider it. See *Carlisle v. Deere & Co.*, 576 F.3d 649, 655 (7th Cir. 2009). And when a document contains mul-tiple layers of hearsay, as some parts of the police reports do, each layer must be admissible. See Fed. R. Evid. 805.

The district court properly considered the evidence here. The officers have offered affidavits adopting the substance of their observations in the police reports as their testimony, a form that is certainly admissible on summary judgment. To the extent the officers reported statements made by others— the robbery victims—those statements were not hearsay because they were not offered to prove that they were true. See Fed. R. Evid. 801(c)(2). The statements by the victims were offered instead to show the officers had information giving them probable cause to arrest plaintiffs, as well as to explain how they perceived Cairel during the interrogation and to show what information they passed on to prosecutors. See *Woods v. City of Chicago*, 234 F.3d 979, 986–87 (7th Cir. 2000).

III. *Federal Due Process Claims*

We turn to the merits. Plaintiffs maintain that a reasonable jury could find they were deprived of liberty without due process of law. Plaintiffs argue in essence that the facts known to the officers and prosecution—including the allegedly coerced and fabricated confessions—could not have supported their arrests and the later decision to prosecute. Plaintiffs cannot, however, bring false arrest claims for violation of their Fourth Amendment rights. They filed suit well outside the two-year statute of limitations period for such claims. See *Wallace v. City of Chicago*, 440 F.3d 421, 424–25 (7th Cir. 2006). Nor can they assert federal constitutional claims for malicious prosecution because Illinois tort law provides an adequate remedy. *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001); see also *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011).

That leaves plaintiffs with three theories that defendants deprived them of liberty without due process of law: (1) by

fabricating evidence; (2) by withholding exculpatory evidence from the prosecutors and plaintiffs themselves; and (3) by coercing a confession from a cognitively impaired person. On this record, we conclude that the district court correctly granted summary judgment on these claims.

A. *Fabrication of Evidence*

Plaintiffs first argue that defendants violated their rights by fabricating Johnson's confession and by tampering with or fabricating the Arias and Micetich identifications. Plaintiffs emphasize that Johnson has always maintained that he never confessed and that defendants cannot point to any objective evidence that he did. As to identifications by the robbery victims, plaintiffs emphasize the discrepancies between their initial descriptions of the robbers and the plaintiffs' actual appearances. They also point to Moore's affidavit saying that Micetich was uncertain about his identifications at the scene of the traffic stop.

Even assuming for the purposes of summary judgment that defendants fabricated evidence, plaintiffs still could not prevail on this claim. For such a claim, the plaintiff must have suffered a deprivation of liberty. See *Saunders-El v. Rohde*, 778 F.3d 556, 561 (7th Cir. 2015); see also *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012). The need to appear in court and attend trial does not constitute such a deprivation. *Saunders-El*, 778 F.3d at 561, quoting *Alexander*, 692 F.3d at 557 n.2. We held in *Saunders-El* that a plaintiff who had been released on bond following his arrest and who was later acquitted at trial could not maintain a due process claim for fabrication of evidence. *Id.* Plaintiffs' evidence-fabrication claims are foreclosed by our holding in *Saunders-El*. Plaintiffs were quickly released on bond following their arrests. Of course, they were

never actually tried, but this, if anything, reduces any burden plaintiffs may have faced.[1]

B. *Withholding Exculpatory Evidence*

Plaintiffs assert constitutional claims based on defendants' alleged failure to disclose exculpatory evidence of their alibi to the prosecution and to the plaintiffs themselves. See *Brady v. Maryland*, 373 U.S. 83, 87–88 (1963) (state violates due process by failing to disclose material exculpatory evidence to defense in time for defendant to make use of it). A corollary of the prosecution's duty to disclose to the defense is that the police must disclose exculpatory evidence to the prosecutors. See *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007), citing *Newsome*, 256 F.3d at 752. A police officer's failure to disclose exculpatory evidence to a prosecutor may foreseeably result in a violation of the accused's due process rights under *Brady*. See *Newsome*, 256 F.3d at 752.

To prevail on a civil *Brady* claim against an officer, an accused must show that (1) the evidence is favorable to him; (2) the evidence was concealed by the officer; and (3) the concealed evidence resulted in prejudice. *Harris*, 486 F.3d at 1014.[2] Prejudice requires proof that the failure to disclose

---

[1] Johnson served one month on probation following his guilty plea. He has not argued in the district court or on appeal that his probation imposed such a restraint upon his liberty as to support a due process claim.

[2] The *Brady* constitutional standard in a criminal case applies to both willful and negligent failures to disclose exculpatory evidence. See *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). For civil claims for due process violations, though, the general rule is that the defendant must have acted intentionally or at least recklessly. See generally *Daniels v. Williams*, 474 U.S. 327 (1986). We can decide this appeal without deciding the required state of mind here.

caused a deprivation of the accused's liberty. See *Armstrong v. Daily*, 786 F.3d 529, 551–52 (7th Cir. 2015) (affirming denial of dismissal where destruction of exculpatory evidence caused accused to spend three additional years in prison pending re-trial until charges were dismissed). Plaintiffs' civil *Brady* claims fail on summary judgment for three separate reasons.

First, plaintiffs' *Brady* theory that the defendant detectives failed to disclose the alibi evidence to prosecutors fails on the evidence. While prosecutor Ciaccia said at her deposition that she did not remember if she was told about Moore and the alibi he offered, there is no dispute that the police reports were sent to the prosecution and contained detailed descriptions of the alibi and the investigation at the repossession center. These undisputed facts show that exculpatory evidence was not concealed by the detectives as required to establish a civil *Brady* claim against them. See *Mosley v. City of Chicago*, 614 F.3d 391, 397–98 (7th Cir. 2010) (civil *Brady* claim failed without evidence that officers withheld any favorable evidence); cf. *Jones v. City of Chicago*, 856 F.2d 985, 995–96 (7th Cir. 1988) (civil *Brady* claim was viable where the prosecutor did not have access to law enforcement files that "would have given any prosecutor pause" about whether to proceed to trial).

Second, the record also could not support plaintiffs' claim that defendants concealed evidence of the alibi from the plaintiffs. Plaintiffs themselves were working with Moore during the times of the alleged robberies and at the time of their arrest. They were well aware that Moore could provide an alibi and that records from the repossession company might corroborate that alibi. The government did not prevent plaintiffs from speaking with Moore or otherwise conceal the evidence

of plaintiffs' alibi from plaintiffs themselves. The plaintiffs cannot establish that defendants concealed exculpatory evidence that was unknown to them as the accused. See *Harris*, 486 F.3d at 1015, quoting *United States v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005).

Plaintiffs' civil *Brady* claims fail for a third reason, which is that they also cannot demonstrate a deprivation of liberty as a result of any alleged failure to disclose the alibi evidence. See *Armstrong*, 786 F.3d at 552 ("The prosecution may fulfill its *Brady* obligation through disclosure in the time leading up to or sometimes even during trial."). Both plaintiffs were released after their arrest, and Cairel was never convicted. We assume that civil *Brady* claims will be viable most often when a defendant has been wrongfully convicted and imprisoned as a result of the *Brady* violation. See, e.g., *Bianchi v. McQueen*, No. 14-1635, — F.3d — , 2016 WL 1213270, at *8 (7th Cir. March 29, 2016). As we explained in *Armstrong*, however, the key to a civil *Brady* claim is not a conviction or acquittal but a deprivation of liberty. *Armstrong*, 786 F.3d at 553–55. Under other circumstances, such as where an accused is held in pretrial custody before acquittal or dismissal, a failure to disclose exculpatory evidence may cause the type of deprivation of liberty required for a *Brady* claim even if the case ends without a trial or conviction. *Id.* at 553 (allowing such a claim for prolonged pretrial detention caused by destruction of exculpatory evidence).[3]

---

[3] Because the exculpatory information was available to Johnson before he pled guilty, we need not decide whether his *Brady* claim survives his decision to plead guilty. See *McCann v. Mangialardi*, 337 F.3d 782, 787–88 (7th Cir. 2003) (suggesting, but not deciding due to lack of evidence, that a

C. *Interrogation of Cairel*

Plaintiff Cairel's final federal claim is that defendants violated his substantive due process rights when they interrogated him. Cairel argues that because he is cognitively impaired, defendants' interrogation of him "shocked the conscience" and violated the substantive due process guarantees of the Fourteenth Amendment. A plaintiff may sue under § 1983 for police behavior that "shocks the conscience," including "conscience-shocking interrogation tactics." *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010), citing *Rochin v. California*, 342 U.S. 165 (1952), and *Wallace v. City of Chicago*, 440 F.3d 421, 429 (7th Cir. 2006). Determining what constitutes such behavior can be difficult; the ultimate question is "whether the conduct is 'too close to the rack and the screw.'" *Id.*, quoting *Rochin*, 342 U.S. at 172. "[L]ying to, threatening, or insulting a suspect" does not shock the conscience. See *id.*, citing *Tinker v. Beasley*, 429 F.3d 1324, 1329 (11th Cir. 2005). And the "official conduct 'most likely to rise to the conscience-shocking level' is the 'conduct intended to injure in some way unjustifiable by any government interest.'" *Chavez v. Martinez*, 538 U.S. 760, 775 (2003), quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

No reasonable juror could find that the tactics the police used with Cairel shock the conscience. They used ordinary interrogation tactics. They may have been particularly insistent, and may have even falsely promised relief if he cooperated,

---

"*Brady*-type disclosure might be required" where "the government possesses evidence that would exonerate the defendant of any criminal wrongdoing but fails to disclose such evidence during plea negotiations or before the entry of the plea").

but those tactics do not shock the conscience. See *Fox*, 600 F.3d at 841.

Plaintiffs contend that interrogation techniques acceptable in most cases should shock the conscience here because Cairel has a learning disability. Moore said in his affidavit that he told defendants that Cairel had a learning disability. That's enough for us to assume for purposes of summary judgment that defendants were aware of Cairel's disability and knew that he might not have been fully able to understand what was going on. Nonetheless, the undisputed facts show that Cairel appeared to participate fully in the interrogation, corrected errors in the written confession as needed, and said he was treated well by the police. The district court correctly granted summary judgment to defendants on all federal-law claims.[4]

IV. *State-Law Claims*

Plaintiffs also assert two state-law tort claims: malicious prosecution and intentional infliction of emotional distress. The district court properly granted summary judgment on these claims, as well.

A. *Malicious Prosecution*

To establish a claim for malicious prosecution under Illinois law, plaintiffs must establish five elements: (1) commencement or continuation of an original proceeding; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages. *Sang Ken*

---

[4] Because the district court correctly found no genuine issue on the merits, we need not address the district court's other holding that this claim was time-barred.

*Kim v. City of Chicago*, 858 N.E.2d 569, 574 (Ill. App. 2006). The failure to establish any one element bars recovery. *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 265 (Ill. App. 2002). On summary judgment, defendants can prevail on such a claim if they demonstrate that no reasonable jury could find an absence of probable cause to initiate the charges. Probable cause is defined as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Id.* at 266. For a malicious prosecution claim, probable cause is determined based upon the facts known to the prosecution at the time of filing, "not the actual facts of the case or the guilt or innocence of the accused." *Sang Ken Kim*, 858 N.E.2d at 574.

Plaintiffs argue there was no probable cause for two primary reasons. Plaintiffs argue that the confessions of Cairel and Johnson cannot support probable cause because they coerced Cairel's confession and fabricated Johnson's confession. Plaintiffs also contend that disparities and hesitation in the robbery victims' identifications mean they also cannot support probable cause. The undisputed facts show, however, that the defendants had probable cause to arrest and charge Cairel and Johnson.

When Cairel was first charged, nothing about his confession undermined probable cause to believe that his confession was true, that two victims had identified him as a robber, and that he had committed the crimes to which he confessed. Johnson presents a different problem. We must assume on summary judgment that he did not in fact confess and that the detectives fabricated the reported confession. We could not affirm summary judgment on the theory that his confession

provided probable cause. Cf. *Washington v. Amatore*, 781 F. Supp. 2d 718, 720 (N.D. Ill. 2011) (holding, in malicious prosecution case, that genuine issue of material fact about probable cause based upon marijuana found in car precluded summary judgment where plaintiff alleged that marijuana was planted by defendant officer).

The problem for plaintiffs is that probable cause against Johnson was also based on both Cairel's confession and the identification by Micetich of Cairel and Johnson as the men who robbed him. See *Aleman v. Village of Hanover Park*, 662 F.3d 897, 907 (7th Cir. 2011) ("Villanueva cannot be said to have lacked probable cause in preparing the charge of aggravated battery merely because he based the charge in part on the worthless 'confession' that he … had extracted from Aleman."); *Nugent v. Hayes*, 88 F. Supp. 2d 862, 869 (N.D. Ill. 2000) ("Even excluding all of the evidence Mr. Nugent claims is tainted or concocted and including all of the evidence that Mr. Nugent believes is exculpatory, the remaining evidence and testimony establishes probable cause to believe that Mr. Nugent [committed murder]."); *Sang Ken Kim*, 858 N.E.2d at 578–79 (affirming summary judgment because probable cause existed at time of arrest despite later recantation of accusation and allegedly coercive interrogation).

Plaintiffs have offered evidence that Micetich expressed some hesitation during his initial identifications and that the identifications did not match his earlier descriptions very well. However, it is undisputed that Micetich did in fact identify Cairel and Johnson as the men who robbed him the night before and that Micetich remained confident in his identification after that. Micetich and Arias's eyewitness identifications were sufficient to establish probable cause. See *Askew v. City*

*of Chicago*, 440 F.3d 894, 896–97 (7th Cir. 2006) ("the sort of in-consistencies and glitches that characterize real investigations do not disentitle police to rely on eyewitness statements"); *People v. Smith*, 630 N.E.2d 1068, 1080 (Ill. App. 1994) ("Infor-mation leading to the arrest of the defendant has been consid-ered reliable where that information was supplied by the vic-tim of the crime or an eyewitness to it."). Because defendants had probable cause when the criminal complaint was filed, plaintiffs' malicious prosecution claim cannot survive sum-mary judgment. See *Fabiano*, 784 N.E.2d at 265.

B. *Intentional Infliction of Emotional Distress*

Plaintiffs also assert a state law claim for intentional inflic-tion of emotional distress based on the defendants' interroga-tion tactics. An intentional infliction of emotional distress claim under Illinois law requires proof of three elements: "First, the conduct involved must be truly extreme and outra-geous. Second, the actor must either intend that his con-duct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause se-vere emotional distress. Third, the conduct must in fact cause severe emotional distress." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (emphasis omitted), quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). "Extreme and outra-geous" conduct does not include "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' Instead, the conduct must go beyond all bounds of decency and be considered intolerable in a civilized community." *Ho-naker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001), quoting *McGrath*, 533 N.E.2d at 809.

Illinois courts generally consider three non-exclusive factors to decide whether conduct is objectively extreme and outrageous in particular cases. See *id.* at 490–92 (collecting cases). First, courts examine the degree of power or authority the defendant holds over the plaintiff. *Id.* at 490–91. This factor carries greater weight where an encounter is atypically severe for the situation, such as where a police officer berates a sexual assault victim instead of assisting the victim and the victim's endangered children. E.g., *Doe v. Calumet City*, 641 N.E.2d 498, 507–08 (Ill. 1994), implicit overruling on other grounds recognized by *DeSmet ex rel. Estate of Hays v. County of Rock Island*, 848 N.E.2d 1030, 1043 (Ill. 2006). Second, courts consider whether the defendant knew the plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that knowledge. *Honaker*, 256 F.3d at 492. Third, courts consider "whether the defendant reasonably believed that his objective was legitimate; greater latitude is given to a defendant pursuing a reasonable objective even if that pursuit results in some amount of distress for a plaintiff." *Id.* at 491, citing *McGrath*, 533 N.E.2d at 810. Police officers, for example, are entitled to perform their law enforcement responsibilities assertively. See *id.*

Plaintiffs argue that defendants' positions of power and Cairel's emotional susceptibility combined to render their conduct outrageous. Defendants' positions of power as law enforcement would be a problem, however, only if their actions were far out of bounds for an interrogation of a lawfully arrested suspect. Plaintiffs do not claim that defendants used anything other than ordinary interrogation tactics.

Cairel's cognitive impairment also did not render defendants' actions extreme and outrageous. Again assuming on

summary judgment that the officers were told that Cairel had a learning disability and took special education classes, the officers did not act inappropriately. A learning disability does not necessarily mean a person is unusually susceptible to emotional distress or unable to participate in an investigation. At any rate, Cairel appeared to the officers to participate fully in the interrogation. He even told the prosecutor that the police had treated him well throughout the interrogation. Taken together, this evidence undermines the claim that defendants acted outrageously despite knowing of his disability.

Finally, defendants had legitimate law enforcement objectives in interrogating plaintiffs. The defendants were attempting to stop a series of robberies by police impersonators, and they lawfully arrested several men who they believed were responsible. The defendants were entitled to try to solve the crimes by investigating and interrogating the plaintiffs.

"[A]n average member of the community" would not "exclaim, 'Outrageous!'" upon learning of defendants' actions in this case. *Doe*, 641 N.E.2d at 507 (internal quotation marks omitted), quoting Restatement (Second) of Torts § 46 cmt. d. Defendants' interrogations did not depart from reasonable and ordinary police practices and thus cannot be said to be "beyond all bounds of decency" as required for outrageous and extreme conduct under Illinois law. *Honaker*, 256 F.3d at 490. As with plaintiffs' federal claims, neither of plaintiffs' state-law claims can survive summary judgment.[5]

The judgment of the district court is AFFIRMED.

---

[5] We need not address the district court's finding that the claim was barred by the statute of limitations.