**2021 UT App 100**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF D.D.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

STATE OF UTAH,
Appellee,
*v.*
D.D.,
Appellant.

Opinion
No. 20200223-CA
Filed September 30, 2021

Seventh District Juvenile Court, Spanish Fork Department
The Honorable F. Richards Smith III
Seventh District Juvenile Court, Monticello Department
The Honorable Mary L. Manley
No. 1160560

Kyler Ovard, Attorney for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN FORSTER concurred.

POHLMAN, Judge:

¶1      D.D.,[1] a teenager with high-functioning autism spectrum disorder, was adjudicated delinquent on two counts of child

---

1. These are not the juvenile defendant's actual initials. Because the issues he raises require a discussion of information relating

(continued…)

sexual abuse. D.D.'s adjudication was based solely on the strength of his multiple confessions to inappropriately touching the genitalia of his niece and nephew. D.D. appeals, challenging the juvenile court's determination[2] that his confessions were sufficiently trustworthy to be admitted into evidence. D.D. also contends that the confessions are insufficient, on their own, to sustain an adjudication of delinquency beyond a reasonable doubt. We affirm.

---

(…continued)
to his health, we refer to him by these initials to protect his privacy.

2. The underlying events that led the State to bring this delinquency action occurred in Utah County, but the juvenile defendant resides in San Juan County. The State thus initiated the delinquency proceedings in the Seventh District Juvenile Court, but the case was transferred to the Fourth District Juvenile Court for the actual adjudication. *See* Utah Code Ann. § 78A-6-350(1)–(2) (LexisNexis Supp. 2021) (allowing juvenile court proceedings to be commenced either in the district where "the minor is living or is found, or in which an alleged violation of law or ordinance occurred," and allowing the original court to then "transfer the case to the district where the minor resides or to the district where the violation of law or ordinance is alleged to have occurred"). While the case was ultimately transferred back to the Seventh District for final disposition and remains pending there, all of the decisions at issue in this appeal were made in the Fourth District.

## BACKGROUND[3]

¶2　D.D. has a history of mental health conditions affecting his ability to interact with others. His teachers started noticing behavioral issues in elementary school, and he has been receiving some form of special education assistance since then. D.D. generally "struggles with social interaction," and at various points during his adolescence he was diagnosed with depression and Asperger syndrome, a condition on the autism spectrum.

¶3　One summer weekend in 2018, D.D.'s older brother (Brother) and sister-in-law (Sister-in-law) invited D.D. to their house to "spend some good time" together. They planned to "devote all the time that [they could] to him that weekend" because D.D. was out of school for the summer and he was spending a lot of time at home alone while his parents worked. Brother and Sister-in-law have two young children (Niece and Nephew), and they live several hours away from D.D.'s hometown. D.D. and Brother had a "close relationship."

¶4　During the visit, while Sister-in-law was outside with Niece and Nephew, Brother had a conversation with D.D. about pornography. Brother was aware that D.D. "had had some involvement" with pornography, and Brother wanted to see if he could help D.D. with something their family considered immoral under their religious views. To aid the discussion, Brother used an interactive book designed to help parents talk to children about their potential exposure to pornography and how to avoid it. As Brother went through the book with D.D., D.D. told him that he had been "looking at pornography basically on a daily

---

3. "In an appeal from a bench trial in juvenile court, we view the evidence in the light most favorable to the juvenile court's ruling, and we recite the facts here with that standard in mind." *In re J.R.H.*, 2020 UT App 155, n.1, 478 P.3d 56 (cleaned up).

basis" and wanted to stop. Brother then discussed some strategies with D.D. on how to resist the urge to look at pornography.

¶5    Later that night, Brother told Sister-in-law about his conversation with D.D. After Brother explained that D.D. was afraid to tell his parents about his pornography habit, Sister-in-law suggested that because she and D.D. had a "good relationship," he could "build up his confidence" to tell his parents by confiding in her. Accordingly, at Brother's urging, D.D. approached Sister-in-law the next day and said that he needed to tell her something. After walking her into the living room where Brother was already sitting, D.D. disclosed that he was "looking at pornography every day for several hours sometimes." Sister-in-law reassured D.D. that she still loved him and said that she and Brother would "help him in any way" they could. At that point, D.D. "got more comfortable" and went into further detail, revealing that he had been looking at pornography of "young girls" and "babies." Sister-in-law asked, "[W]hen you say babies, what does that mean?" D.D. elaborated that he meant "babies like that can't talk."

¶6    Brother and Sister-in-law were both shocked by D.D.'s revelation, and Sister-in-law, while expressing appreciation for D.D.'s honesty, told him that this was "really serious" and that those were images he could "never look at." Brother and Sister-in-law again brainstormed with D.D. how he could avoid the temptation to look at pornography, at which point Sister-in-law suggested that because D.D.'s mother (Mother) was coming to the house that afternoon, D.D. could tell her about the pornography issue while Brother and Sister-in-law were there for support.

¶7    When Mother arrived, D.D. told her everything he had just revealed to Brother and Sister-in-law, including that he was viewing child pornography. Mother was upset at first, but after

calming down she asked D.D. questions while "letting him express everything."

¶8 The next day, while Sister-in-law was at work, she began to more fully process her conversations with D.D. She called her aunt for advice, who expressed her view that it would be in everyone's "best interest" if D.D. reported himself to police, and she also suggested that "a lot of times when kids are looking at that type of pornography, they'll act out on it." Sister-in-law relayed the advice to Brother, and they both resolved to convince Mother that D.D. needed to report to police that he was viewing child pornography.

¶9 After Brother and Sister-in-law arrived home from work, Brother began speaking with Mother about D.D. reporting himself to police. Meanwhile, Sister-in-law and D.D. sat on the porch talking; D.D. was trying to convince Sister-in-law to allow him to live with them full-time, while Sister-in-law was brainstorming potential places D.D. could get a job back in his hometown. As they were talking, Sister-in-law recalled what her aunt had told her about viewers of child pornography acting out on their desires, "[a]nd all of a sudden it clicked for [her]" that if D.D. was looking at child pornography, her own children could be at risk. She waited for D.D. to finish what he was saying, and said, "[D.D.], I need to ask you have you ever touched my kids?" D.D. looked away from her and "kind of shrugged his shoulders and . . . did a little giggle like oh well." Troubled by his reaction, Sister-in-law asked D.D. to look at her and she again inquired, "[H]ave you ever touched my kids?" D.D. answered that he had, which prompted Sister-in-law to ask, "[W]hen?" D.D. responded that he had done it "every time" he had come to their house or the family had visited his house. At that point Sister-in-law "couldn't talk" and was "bawling," but D.D. continued, "I wait until they are asleep. And I go into the rooms that they are in. I make sure to make noise on the wall or I hit things to make sure that they are asleep." With regard to Niece, he further explained

that he would "tap her to make sure she [was] asleep," then proceed to take off the covers, "bring her panties down to her knees," "run his finger around her genitalia," and sometimes "touch[] inside her genitalia."

¶10 Before D.D. could say more, Sister-in-law left to find Brother and tell him what D.D. had just told her. She "collapsed several times" on the way, and could not articulate what the matter was when she approached Mother and Brother. Mother saw this behavior and uttered, "[D]on't tell me he touched one of your kids." Sister-in-law nodded in affirmation, prompting Brother to leave the room to deal with his emotions. Once Brother had regained his composure, he confronted D.D. with similar questions to those asked by Sister-in-law, and D.D. "admitted [it] again to him." In this opinion, we refer to D.D.'s admissions to Sister-in-law and Brother as the Initial Confessions.

¶11 At that point, Brother and Sister-in-law called the police. Upon arriving at the house, one of the responding officers (Officer) gathered statements from Brother and Sister-in-law and then located D.D., who was "curled in a ball under the dash" of a vehicle parked out front. Officer advised D.D. of his *Miranda* rights and "simply asked him if he knew why [the police officers] were there." D.D. responded that it was "because he had inappropriately touched his niece," and volunteered that the touching had occurred while she was sleeping and that "he had penetrated her with his fingers." Officer then stopped D.D. from speaking further because Officer had gathered enough to know that the case would need to be referred to detectives for full investigation. In this opinion, we refer to D.D.'s admissions to Officer as the Vehicle Confession.

¶12 After being taken to the local police station, D.D. was interviewed by two detectives. With Mother present, D.D. was read his *Miranda* rights and "[h]e waived them and he spoke

freely." One of the detectives asked D.D. why he was there and D.D. responded that it was because he had "sexually abused his niece." When asked what he meant by that, D.D. stated that he had "touched her private areas"; on being asked what he thought private areas were, he specified that he was talking about "her butt and her vagina." He described that the first touching had occurred approximately two years prior—when Niece would have been four or five years old—during a family visit to Brother and Sister-in-law's house. On that occasion, he "lifted [Niece]'s underwear up and he touched it"; when asked what "it" meant, he stated that it was her vagina.

¶13    When asked how many times this had happened, D.D. said it had occurred three times. The second touching occurred on an unspecified date when Brother's family was visiting D.D. and his parents at their home, and the third touching was during another visit to Brother's house; both of these instances also occurred while Niece was sleeping.

¶14    D.D. was then asked "if this ha[d] happened to anyone else," and he stated that on one occasion, while Brother and Sister-in-law were changing Nephew's diaper, D.D. "touched the tip of [Nephew's] penis" when his parents were not looking. Although this incident occurred at an unspecified time, Nephew was three years old at the time D.D. was being interviewed. One of the interviewing detectives later offered his view that, taken in context, D.D. was describing a touching that was "inappropriate[] because [Sister-in-law and Brother] were changing [Nephew]'s diaper," and D.D. did it "when they weren't looking." In this opinion, we refer to D.D.'s admissions

to the detectives during their interview as the Police Station Confession.[4]

¶15 The next day, Brother and Sister-in-law brought Niece and Nephew to the Children's Justice Center to be interviewed about any potential abuse. At the interview, Niece—who was six years old at the time—was "engage[d]" and would answer questions when prompted. Nephew—who was three years old at the time—showed little interest in being interviewed. Neither child reported any touching whatsoever. However, this was not necessarily inconsistent with D.D.'s narrative, because Nephew was still in diapers when the touching allegedly occurred. And Niece—who, according to D.D., was asleep when the touchings occurred—was a notoriously deep sleeper, with Brother describing how, once she was asleep, "you could honestly pick her up, throw her on the couch and she wouldn't even know."

¶16 Based on D.D.'s several confessions, the State charged him with two delinquency counts—one for each victim—of sexual abuse of a child under fourteen, a second-degree felony if committed by an adult. Shortly after the initial pretrial conference, D.D.'s trial counsel moved to stay the proceedings to allow D.D. to undergo a competency evaluation. The juvenile court granted the motion and an evaluation was conducted by a licensed psychologist (Evaluator 1). In his report, Evaluator 1 opined that although D.D. possessed "a rational and factual understanding of the proceedings against him" and the applicable punishment, he did not have "the capacity to adequately consult with his counsel and to participate in the proceedings against him with a reasonable degree of rational understanding." In support of his opinion, Evaluator 1 cited D.D.'s diagnoses of unspecified depressive disorder and autism

---

4. D.D. also indicated to the detectives during this interview that he had been viewing child pornography.

spectrum disorder, and observed that this and his other diagnosed disorders caused "mild-to-moderate impairment in his capacity to reason, to consider consequences, and to make judgments." (Cleaned up.) Evaluator 1 also noted how D.D.'s thought content was "somewhat slow but [showed] no evidence of hallucinations, delusions or paranoia," and observed that "with prompts he typically recalled information." After hearing evidence on D.D.'s competency, including Evaluator 1's opinions, the juvenile court concluded that D.D. was "not competent to proceed," but that competency would be "attainable," and ordered that a competency attainment plan be completed.

¶17 A few months later (about six months after the Initial Confessions), D.D. sent Brother several text messages "out of nowhere, [with] no prompting whatsoever." In the first message D.D. lamented that Brother and Sister-in-law had not been in contact with the rest of the family. In a second message he stated:

> I'd really appre[ci]ate it if you'd drop the co[u]rt s[t]uff, if you can. I learned my lesson. I now know what happens when I do stuff like that. I'm soooo sooo sooo very sorry about what I did to your kids. I just wish I could go back in time or have a do over and stop my[]self from ever doing that and never do that. I just wish I never would have done those things in the first place to begin with. When I first touched [Nephew] and [Niece], I didn't know that all of this would have happened. If I would have known that all of this would have happened, I NEVER would have touched [Nephew] and [Niece], like that in the first place.

In this opinion, we refer to the content of these text messages from D.D. to Brother collectively as the First Text Message Confession.

¶18    After D.D. had participated in attainment services for about six months, Evaluator 1 conducted a second competency evaluation. Evaluator 1 again opined that D.D. was not competent to stand trial for the same reasons articulated in his original report. The juvenile court held a hearing to consider Evaluator 1's opinions, after which it ordered that "a new updated evaluation [be conducted] by an independent evaluator." A new psychologist (Evaluator 2) then evaluated D.D. and determined that the "attainment services were successful" and that D.D. had been "restored to competence to stand trial." (Cleaned up.) Specifically, Evaluator 2 noted how D.D. "appear[ed] capable of providing . . . information regarding his alleged offense, his involvement in the alleged offense, . . . and his state of mind at the time of the alleged offense," and that "[h]e seemed to have adequate recall of the events leading up to his arrests." Thus, based on testing and direct observations, Evaluator 2 concluded, among other things, that D.D. appeared to be capable of understanding the charges against him, was capable of providing his attorney relevant information regarding his involvement in the alleged crimes, and would be able to cooperate with his attorney and participate in his own defense.

¶19    As D.D.'s case proceeded, his attorney filed a motion in limine seeking to exclude D.D.'s confessions from being presented at trial, arguing that they could not meet the trustworthiness standard articulated in *State v. Mauchley*, 2003 UT 10, 67 P.3d 477,[5] because there was "no independent evidence" of the charged crimes. After hearing argument on the motion, the court determined that the matter should proceed to

---

5. *See infra* ¶¶ 29–33.

an adjudication because "[t]he State ha[d] not yet had the opportunity to present its corroborating evidence to establish the trustworthiness of [D.D.'s] confessions." But the court also ruled that, before any confessions could be admitted into evidence, the State would first have to "present evidence regarding the trustworthiness of [D.D.'s] alleged confessions," and the court would have to determine that each confession met the trustworthiness standard by a preponderance of the evidence. The court then set the case for trial.

¶20    About six weeks before trial, D.D. again texted Brother, apparently unprompted. The message read:

> [Brother] I want [yo]u to know that I'm so very sorry for what[] I did to your kids. . . . You didn't need to tell [our sister] all of that stuff. How would you have felt if all of that stuff happen[ed] while you were on your mission and [our sister] told you that I touched her kids like that. . . . Inste[a]d of calling the police on me you should have took a second to breath[e]. . . . I WASN'T saying that I was planning on doing that to [our sister's] kids, because I wasn't[.] I learned my lesson from doing that.

D.D. then sent another message the same day which read, in relevant part, "I know that way deep down you know that if mom knew that I was mast[u]rbating [she] wouldn't let me keep doing it and the same with me touching [Niece] and [Nephew] the way I did." In this opinion, we refer to the content of these text messages from D.D. to Brother collectively as the Second Text Message Confession.

¶21    A one-day bench trial was held in August 2019, at which the State, as part of its case-in-chief, presented testimony from Brother, Sister-in-law, Officer, and one of the detectives who interviewed D.D. While being examined on redirect with respect

to her portion of the Initial Confessions, Sister-in-law was asked by the prosecutor whether she had been "providing cues or clues or direction" to D.D. when she initially asked D.D. whether he had touched her children, which would have potentially indicated to him that he could "please" her by answering a certain way. Sister-in-law responded,

> No, not at all. . . . I mean it was a yes or no question, . . . [and] there [were] no additional questions. He answered my question and then he continued to tell me more and more details about [the abuse]. . . . It was him telling a story and telling me exactly what had occurred with my daughter.

Sister-in-law also offered her view that D.D. "has always been honest . . . to a point where . . . sometimes [it] gets him in trouble," and that "when he does lie, it's very obvious."

¶22 During the State's presentation of evidence, the defense renewed its objection that D.D.'s confessions did not meet the *Mauchley* standard. With regard to the Initial Confessions, the court determined that they were trustworthy, observing that D.D.'s admissions were "spontaneous" because "[n]othing was coerced or forced," and that D.D. was a "young man who typically is honest about things." The court likewise concluded that the Vehicle Confession was "clearly spontaneous," finding that there was "[n]othing to indicate that anything was forced or coerced." And finally, it admitted into evidence testimony about the Police Station Confession and screenshots of the First and Second Text Message Confessions.[6]

---

6. Defense counsel expressly renewed his objection to the Initial Confessions and the juvenile court entered specific findings regarding their trustworthiness. Although defense counsel did

(continued…)

¶23    Following presentation of the State's case-in-chief, D.D.'s counsel moved for directed verdict, asserting that, even if the confessions had been trustworthy enough to be admitted into evidence, they were not enough—on their own—to sustain a delinquency adjudication beyond a reasonable doubt. The court denied the motion.

¶24    D.D. then presented his case-in-chief, during which Evaluator 1 testified that in examining individuals with autism spectrum disorder, he likes to ask misleading questions "to see how they acquiesce" to an "authority figure." In evaluating D.D., he observed that some of his answers were "credible and accurate and verified by collateral sources," but that "he seemed to acquiesce to authority figures . . . when [Evaluator 1] asked him a misleading question." But on cross and on redirect, Evaluator 1 clarified that he did not necessarily hold a view that the fleeting deference to authority figures he observed in D.D. impacted D.D.'s decision to confess the charged conduct to multiple people, but rather that D.D.'s responses indicated a risk that he might "occasionally" acquiesce to an authority figure if one were to ask him "leading questions."

¶25    After closing arguments, the juvenile court took the matter under advisement and a few weeks later issued its ruling, finding D.D. delinquent beyond a reasonable doubt on both charges. D.D. appeals.

---

(…continued)

not expressly renew his objection to the Vehicle Confession, the court entered specific findings on its trustworthiness at the conclusion of Officer's testimony. With regard to the remaining confessions, no express objection was made and no findings were entered, although evidence of each confession was admitted.

ISSUES AND STANDARDS OF REVIEW

¶26    D.D. raises two issues on appeal. He first argues that the juvenile court erred by admitting all of his out-of-court confessions, asserting that they were insufficiently trustworthy to be admitted into evidence. A lower court's determination that a confession is sufficiently trustworthy to be admitted into evidence is a legal determination. *See State v. Mauchley*, 2003 UT 10, ¶ 61, 67 P.3d 477 ("[T]he trial judge must determine as a matter of law that the confession is trustworthy before it may be admitted."). Thus, it is a decision we review for correctness. *State v. Bran*, 2021 UT App 62, ¶ 9, 492 P.3d 147 ("We review the legal determinations leading to an admissibility ruling for correctness." (cleaned up)).

¶27    Second, D.D. asserts that the court erred in adjudicating him delinquent because the State presented insufficient evidence to sustain such a decision beyond a reasonable doubt. "When reviewing a juvenile court's decision for sufficiency of the evidence, an appellate court must consider all the facts, and all reasonable inferences which may be drawn therefrom, in a light most favorable to the juvenile court's determination, and we reverse only when it is against the clear weight of the evidence, or if [we] otherwise reach[] a definite and firm conviction that a mistake has been made." *In re J.R.H.*, 2020 UT App 155, ¶ 9, 478 P.3d 56 (cleaned up).

ANALYSIS

¶28    We begin with D.D.'s challenge to the juvenile court's decision to admit his confessions, in which he argues that they were insufficiently corroborated under *State v. Mauchley*, 2003 UT 10, 67 P.3d 477. We then address D.D.'s argument that the confessions were insufficient on their own to support a finding of delinquency beyond a reasonable doubt.

I

¶29   In Utah, a criminal "defendant may not be convicted unless there exists independent evidence of the crime, a corroborated confession, or a combination of both that furnishes proof beyond a reasonable doubt that the defendant is guilty of the crime charged." *State v. Mauchley*, 2003 UT 10, ¶ 61, 67 P.3d 477 (cleaned up). This is because "no defendant can be convicted solely on the basis of an uncorroborated out-of-court confession." *Id.* ¶ 50 (cleaned up). But before a defendant's confession may be considered by the factfinder, the trial court takes on a "gatekeeping function," in which it seeks to corroborate the confession "as a matter of law" by determining whether the confession is "trustworthy" based on the "totality of the circumstances" surrounding the confession. *See id.* ¶ 58 & n.6. Thus, a confession may be corroborated and admitted into evidence only after it is "deemed trustworthy by a preponderance of the evidence." *Id.* ¶ 58. Neither side suggests that a different standard applies to juvenile court delinquency proceedings, and we have no reason to assume otherwise. *Cf. In re P.G.*, 2015 UT App 14, ¶¶ 24–25, 343 P.3d 297 (discussing contours of the *Mauchley* trustworthiness standard and implying that it applies to admissibility of juvenile confessions, although declining to address the juvenile defendant's *Mauchley*-based arguments on the merits for lack of preservation).

¶30   D.D. contends that all of his confessions were inadmissible simply because "there was no independent evidence that the crime occurred," and that the juvenile court misapplied *Mauchley* in concluding otherwise. But D.D. appears to harbor a fundamental misunderstanding of our supreme court's holding in *Mauchley*.

¶31   D.D. is correct that to establish the trustworthiness of a confession, "the State must introduce substantial independent evidence" which "strengthen[s] and add[s] weight or credibility

to the confession, so as to produce a confidence in the truth of the confession." *Mauchley*, 2003 UT 10, ¶ 50 (cleaned up). Importantly, however, "[s]ubstantial independent evidence supporting the trustworthiness of a confession *need not necessarily* include independent evidence of the crime" itself. *Id.* ¶ 51 (emphasis added). In other words, the State may elect to corroborate the confession with independent evidence of the crime, but the confession may also be corroborated—and therefore admitted—without it. *See id.* ¶ 49 (noting that "the State does not *have* to provide independent evidence that a harm or injury occurred by criminal act before a confession may be admitted to help establish guilt" (emphasis added)); *see also id.* ¶¶ 51–56 (describing the different corroboration standards for establishing trustworthiness when there is no independent evidence that a crime occurred versus when there is independent evidence that a crime occurred). Thus, "in cases such as this one, where there is no evidence of a crime independent of the confession, the State may . . . establish the trustworthiness of the confession with other evidence typically used to bolster the credibility and reliability of an out-of-court statement."[7] *Id.* ¶ 51 (cleaned up).

¶32 The context of our supreme court's decision in *Mauchley* helps draw this important distinction. Prior to *Mauchley*, Utah adhered to the corpus delicti rule, which required a defendant's

---

7. D.D.'s confusion may stem from the term "corroborated confession," which arguably suggests on its face that the confession must be corroborated by other evidence of the crime. But as *Mauchley* makes clear, a corroborated confession does not require independent evidence of the crime; rather, a corroborated confession is a trustworthy confession as established by the evidence of the circumstances surrounding the confession itself. *See State v. Mauchley*, 2003 UT 10, ¶¶ 49, 51–53, 67 P.3d 477.

confession to be corroborated through the State producing "evidence that the specified offense occurred."[8] *Id.* ¶¶ 14–15 (cleaned up). But in *Mauchley*, the court joined "the federal courts and a growing number of state courts" in abandoning the corpus delicti rule in favor of the "new version of the corroboration rule," which "requires corroboration of the confession itself rather than corroboration that a crime was committed." *Id.* ¶¶ 19, 48. In so doing, our supreme court recognized the limitations of the corpus delicti rule in modern criminal law. *See generally id.* ¶¶ 21–33, 41–47. For example, the court explained that "[b]ecause inappropriate sexual contact often produces no tangible injury," and may lack independent proof particularly where young children are involved, "applying the corpus delicti rule to such situations seems especially troublesome." *Id.* ¶ 29. But the court added that "[a]lthough [it was] overturn[ing] the corpus delicti rule, [it was] not eliminating the corroboration rule because . . . the need still exists to prevent errors in convictions based upon untrue confessions alone." *See id.* ¶ 47 (cleaned up). The court therefore adopted the trustworthiness standard, which focuses on "whether a defendant's confession is sufficiently trustworthy or reliable to be admitted into evidence." *Id.* ¶ 19.

---

8. The corpus delicti rule is so termed because the "orthodox version of the rule requires corroboration of the corpus delicti," a Latin term meaning the "body of the crime." *Id.* ¶ 15 (cleaned up). The rule originated in the English common law and developed to "prevent innocent persons from being convicted when they falsely confess to committing a crime that was never committed or was committed by someone else." *Id.* ¶¶ 12–14 (cleaned up). Under Utah's corpus delicti rule, the State was required to corroborate a defendant's confession by putting on some other evidence "that a harm or injury occurred by criminal act," but it was not required to show that "the defendant was the perpetrator." *Id.* ¶ 16.

¶33    In adopting and discussing the contours of the trustworthiness standard, the *Mauchley* court identified a non-exclusive list of "factors" that "have applicability in determining the trustworthiness of confessions," including: "evidence as to the spontaneity of the statement; the absence of deception, trick, threats, or promises to obtain the statement; the defendant's positive physical and mental condition, including age, education, and experience; and the presence of an attorney when the statement is given." *Id.* ¶ 52. The court also emphasized that, as a general matter, "the overall facts and circumstances related in the confession must be consistent with facts otherwise known or established." *Id.* ¶ 53 (cleaned up).

¶34    At the outset, we observe that no attorney was present during any of D.D.'s confessions; thus, the fourth factor identified by the *Mauchley* court weighs against a trustworthiness determination.[9] But since the trustworthiness standard is adjudged based on the "totality of the circumstances," *id.* ¶ 58, this fact alone does not end the analysis.

¶35    Next, as to the spontaneity of the statements during each confession—the first *Mauchley* factor—D.D. asserts that his confessions were "never spontaneous." But we do not view the circumstances surrounding his confessions as yielding such a straightforward pronouncement on spontaneity. For starters, "spontaneous" can take on subtly

---

9. D.D. frames his challenge to the court's decision to admit his confessions generally by asserting that his confessions were collectively untrustworthy, without delineating a *Mauchley* factor-based analysis for each confession individually. Accordingly, we analyze the applicability of each *Mauchley* factor to D.D.'s confessions as a whole, as opposed to, for instance, analyzing the factors present with respect to each confession.

different definitions, depending on how the word is used.[10] *See Spontaneous*, Merriam-Webster, https://www.merriam-webster.com/dictionary/spontaneous [https://perma.cc/EFM6-FT67]. For instance, it is sometimes defined as something "developing or occurring without apparent external influence, force, cause or treatment," or "arising from a momentary impulse." *Id.* Applying this definition, the First and Second Text Message Confessions qualify as spontaneous. They appeared to be impulsive and without any apparent external influences, as D.D. sent them to Brother via completely unsolicited text messages. Indeed, Brother noted how the texts came "basically out of nowhere," with "no prompting whatsoever," after Brother and his family had no contact with D.D. for several months.

¶36 The Initial Confessions, on the other hand, were in response to Sister-in-law directly asking D.D. whether he had "ever touched [her] kids," and Brother's similar questioning. And the Vehicle and Police Station Confessions were prompted by questions that, while more generic, were still apparent external influences which, in some sense, led him to confess. D.D.'s affirmative answers in response to such direct questioning for each of these in-person confessions thus would not qualify as impulse-driven utterances without external influences. Nevertheless, as mentioned, "spontaneous" has multiple

---

10. Indeed, other jurisdictions that apply a factor-based trustworthiness analysis appear to consider the word to mean different things depending on the context. *See, e.g.*, *State v. Cook*, 610 A.2d 800, 806 (N.H. 1992) (suggesting that a spontaneous inculpatory statement is one that is "volunteered in response to a question that was neither leading or suggestive"); *United States v. Camacho*, 163 F. Supp. 2d 287, 305–06 (S.D.N.Y. 2001) (collecting cases and applying principle of spontaneity in the context of making a statement to a friend or close acquaintance, as opposed to confessing to law enforcement).

definitions; it can also mean "controlled and directed internally" or "not apparently contrived or manipulated." *See id.* Applying these definitions, the Initial, Vehicle, and Police Station Confessions appear more spontaneous because, while the initial questions posed certainly were the stimuli that got D.D. talking, he volunteered the detailed information about touching Niece and Nephew without any cajoling. Thus, these confessions can also be considered spontaneous based on the level of detail that D.D. volunteered without being pressed or manipulated into doing so. Indeed, the juvenile court appears to have applied such a definition of the word when it found that the Initial Confessions were spontaneous because "[n]othing was coerced or forced," and that the Vehicle Confession was "clearly spontaneous," because there was "[n]othing to indicate that anything was forced or coerced." Thus, while the spontaneity factor yields more nuanced results among the in-person confessions depending on the definition of spontaneous used, this factor weighs heavily in favor of the First and Second Text Message Confessions' trustworthiness.

¶37   As to the second trustworthiness factor, D.D. concedes that "there was no deception, trick, threats or promises explicitly used to obtain the . . . confessions," but he nevertheless argues that his confessions are unreliable because he was "faced with a deceptive environment that prompted him to answer 'yes' to all of the questions asked by both [Brother] and [Sister-in-law]." Specifically, D.D. points to his "sense of religious duty," Brother's initiation of the pornography discussion, and D.D.'s close relationship with Brother and Sister-in-law, all of which would have supposedly caused D.D. to "want[] to please them in any way he could." Yet in so arguing, D.D. does not explain how these alleged pressures would compel a false confession. For example, while it may be that a person might confess to wrongdoing based on a moral commitment to tell the truth, we are not persuaded that D.D. would *lie* about touching Niece and Nephew out of religious obligation. Similarly, we are not

persuaded that the pornography discussion created a deceptive environment that would cause D.D. to confess to something he did not do. Brother and Sister-in-law simply provided a safe environment for D.D. to discuss his pornography habit; they did not pressure him, they did not trick him, and they did not make promises to him that might have led him to falsely confess. Finally, D.D. has not articulated how his desire to "please" his Brother and Sister-in-law would compel him to confess to sexually abusing their children if it were untrue—especially when considering that the context of his confession to Sister-in-law was in the midst of trying to convince her to let him move in with them. If D.D. had wanted to please his Brother and Sister-in-law while advancing his own objective, he presumably would have denied touching their children. We therefore reject D.D.'s suggestion that the environment in which D.D. confessed undermined the trustworthiness of his confessions.

¶38 Furthermore, applying the second factor to the confessions where it would traditionally be relevant—namely the Vehicle and Police Station Confessions—supports a determination of trustworthiness because both Officer and the interviewing detective asked D.D. very straightforward, open-ended questions, to which D.D. responded with lengthy narratives and explanations—a far cry from the type of situation that would implicate a contrary finding under the second factor. *Cf. In re P.G.*, 2015 UT App 14, ¶¶ 2–14, 343 P.3d 297 (upholding a juvenile defendant's confession as voluntary after "[l]ooking at the totality of the circumstances," even though his police interview lasted forty minutes, involved "persistent . . . interrogation techniques," and neither the juvenile's parents nor his attorney were present). And finally, our review of the screenshots admitted into evidence reveals no degree of deception or threat present in either of the Text Message Confessions, as D.D. appears to have initiated those communications completely unsolicited. Accordingly, we are unable to discern any degree of deception present with any of

D.D.'s confessions, meaning that the second factor weighs in favor of all the confessions being deemed trustworthy.

¶39　D.D. relies heavily on the third factor—"the defendant's positive physical and mental condition, including age, education, and experience," *see Mauchley*, 2003 UT 10, ¶ 52—in arguing that his confessions are untrustworthy. He asserts that this factor "overwhelmingly cuts in his favor" based on "his disability, his diminished ability to track and recall conversation, and his tendency to acquiesce to authority." The State, on the other hand, contends that the record does not provide "a basis to believe that D.D.'s [diagnosis with autism spectrum disorder] undermined the credibility of his confessions." We agree with the State.

¶40　Based on our review of the record, it is apparent that D.D.'s autism spectrum disorder affects his interactions with others. For example, during Evaluator 2's investigation, D.D.'s father described how there are "countless examples" in D.D.'s life of him "'not getting it' when it comes to normal social interactions." His father described how D.D. "does not understand sarcasm" and, when he was younger, "he never played with [other] kids he just played 'by kids'"—behavior Evaluator 2 described as "parallel play." D.D.'s father also offered his view that D.D. "didn't seem to understand the gravity" of going to court and being the subject of a delinquency adjudication—a concern that was echoed by Evaluator 1 in his competency evaluations. However, diagnosis with a mental disorder, without more, "does not necessarily mean a person is unusually susceptible to emotional distress or unable to participate in an investigation." *See Cairel v. Alderden*, 821 F.3d 823, 836 (7th Cir. 2016). Indeed, we have previously rejected the argument (albeit in a different context) that "all mental disorders affect a person's credibility," because not "all mental disorders affect [the] ability to perceive, recall, and relate events." *See State v. Stewart*, 925 P.2d 598, 600 (Utah Ct. App. 1996). Instead, to be

relevant to the trustworthiness analysis, D.D.'s condition must relate to his ability to tell the truth. *See Mauchley*, 2003 UT 10, ¶ 50 (discussing that, to meet the trustworthiness standard, "independent evidence must strengthen and add weight or credibility to the confession . . . so as to produce a confidence in the truth of the confession" (cleaned up)). And based on the totality of the evidence, there is no indication that D.D.'s mental disorder affected the trustworthiness of his confessions. D.D. was repeatedly described by Sister-in-law as an "honest" person—sometimes "to a fault." Evaluator 1 noted how D.D.'s thought content was "somewhat slow but [showed] no evidence of hallucinations, delusions or paranoia," and observed that "with prompts he typically recalled information." And Evaluator 2 considered D.D.'s behavior to be indicative of "someone with high-functioning autism." Indeed, Evaluator 2 noted how D.D. "appear[ed] capable of providing . . . information regarding his alleged offense, his involvement in the alleged offense, . . . and his state of mind at the time of the alleged offense," and that "[h]e seemed to have adequate recall of the events leading up to his arrest[]." Thus, based on the record before us, we are not persuaded that D.D.'s diagnosed mental condition affects his ability to tell the truth.

¶41   D.D. resists this conclusion, pointing to the fact that he was declared incompetent to stand trial for roughly a year. But the basis that led to this declaration was Evaluator 1's concern that D.D. was mildly to moderately impaired in his capacity to reason, consider consequences, or exercise judgment—not that he struggled in his ability to relate facts or to tell the truth. Indeed, Evaluator 1 clarified during his trial testimony that he did not even necessarily hold a view that D.D.'s fleeting deference to authority compelled D.D. to confess the charged conduct to multiple people; rather, he believed that D.D. might "occasionally" acquiesce to an authority figure if one were to ask him "leading questions." But D.D. was not asked leading questions that would have put him at risk in any of the

circumstances leading to his confessions. Instead, D.D. confessed to multiple individuals in response to open-ended or yes-no questions, and he volunteered details about the abuse without any prompting and without any suggestion from others about how he had touched Niece and Nephew. Accordingly, we do not conclude that, based on the totality of the circumstances, D.D.'s mental condition negatively impacted the trustworthiness of his confessions, and therefore the third factor weighs in favor of corroborating D.D.'s confessions.

¶42 Finally, in addition to the four trustworthiness factors named in *Mauchley*, we must also consider whether "the overall facts and circumstances related in the confession [are] consistent with facts otherwise known or established." *See* 2003 UT 10, ¶ 53 (cleaned up). An anecdote included in *Mauchley* exemplifies this broad yet critical underlying rule, and offers parallel reasoning for the facts at issue in this case: "if a man spontaneously confesses that he fondled a child, but the evidence demonstrates he was never in physical proximity with the child, his confession is likely untrustworthy because the facts related in the confession are inconsistent with otherwise known or established facts." *See id.* The exact opposite is the case with D.D.'s confessions, bolstering our confidence that the confessions are trustworthy.

¶43 The testimony at trial established that D.D. was repeatedly in "physical proximity with the child[ren]" during the times that he stated the touchings occurred. Both Brother and Sister-in-law described how D.D. would visit them periodically and spend the night at their house, and that they would do the same and spend the night at his house, tracking with D.D.'s narrative that the instances of abuse occurred "every time" he had come to their house or the family had visited his house. And Brother described how Niece was a notoriously deep sleeper, a fact which would be consistent with D.D. being able to touch Niece without waking her up. Furthermore, the details included

in each confession are generally consistent with one another—a factor that other jurisdictions applying the trustworthiness standard often include alongside the four factors identified in *Mauchley. See, e.g., State v. Dern*, 362 P.3d 566, 583 (Kan. 2015) (stating that a "determination of trustworthiness will depend on the totality of the circumstances and may include a consideration" of several "nonexclusive factors," including close variants of the factors identified in *Mauchley*, as well as "the number of times the confession was made and the consistency or lack thereof between different versions of the confession"); *see also Chambers v. Mississippi*, 410 U.S. 284, 300 (1973) ("The sheer number of independent confessions provided additional corroboration for each."). These additional characteristics present across all of D.D.'s confessions are thus further indicia that the confessions were trustworthy.

¶44    Based on the foregoing analysis considering each of the factors articulated in *Mauchley*, as well as the overarching direction to consider the "overall facts and circumstances related in the confession" and their correlation to "facts otherwise known or established," *see* 2003 UT 10, ¶¶ 52–53 (cleaned up), we conclude that the juvenile court did not err in determining that all of D.D.'s confessions were trustworthy as a matter of law.

II

¶45    D.D. next argues that, even if the confessions were sufficiently corroborated to be admitted into evidence, they were insufficient on their own to support a finding of delinquency beyond a reasonable doubt. Because in Utah corroborated confessions are sufficient to sustain a finding of delinquency on their own, we reject this argument and conclude that the juvenile court did not err in adjudicating D.D. delinquent.

¶46    Even after a court has found that a defendant's confession satisfies the trustworthiness standard and may be admitted into

evidence, the State must still meet its burden of "establish[ing] all elements of the offense" in order to prove to the factfinder that the defendant is guilty beyond a reasonable doubt. *See State v. Mauchley*, 2003 UT 10, ¶¶ 49, 61, 67 P.3d 477 (cleaned up). And although the various rules on admissibility "do not specify what evidence is required to sustain a conviction" on appeal, "sufficiency of the evidence rules do address what evidence is required." *Id.* ¶ 71. "In order to overturn the juvenile court's decision as to the sufficiency of the evidence, the result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *In re J.H.*, 2012 UT App 195, ¶ 2, 283 P.3d 971 (per curiam) (cleaned up). This is because "[t]he juvenile court is in the best position to weigh conflicting testimony, to assess credibility, and from such determinations, render findings of fact." *Id.* Furthermore, "corroboration of the confession itself is sufficient to sustain" a finding of delinquency on appeal, because a finding of guilt beyond a reasonable doubt may be supported by "independent evidence of the crime, a corroborated confession, *or* a combination of both." *See Mauchley*, 2003 UT 10, ¶¶ 61, 76 (emphasis added); *see also id.* ¶¶ 77–78 (noting how "the corroboration rule" and its "trustworthiness standard pertains not just to the admissibility, but also to the sufficiency of the evidence").

¶47 D.D. nevertheless argues generally that the confessions, on their own, are not enough to sustain the juvenile court's finding of delinquency. In so doing, he cites *Mauchley* and largely parrots the same arguments he made with regard to the confessions' trustworthiness, asserting again that the State was required to produce independent evidence before the confessions could be corroborated and relied upon as evidence in support of a delinquency finding. He also contends that the juvenile court "incorrectly coalesced" the corroboration analysis and its factfinding role. Here again, D.D. appears to misunderstand the holding of *Mauchley*; as noted, our supreme

court made clear in that case that a corroborated confession is itself sufficient to sustain a finding of delinquency on appeal. *See id.* ¶¶ 61, 76. And in D.D.'s case there is not only one corroborated confession but multiple corroborated confessions, all of which are factually consistent with one another.

¶48 As to his other argument regarding the juvenile court's role as evidentiary gatekeeper and factfinder, D.D. is correct to note that, after a confession has been corroborated, the factfinder "may nevertheless still consider for itself the weight it wishes to give to the confession." (Quoting *Mauchley*, 2003 UT 10, ¶ 61.) But D.D. has not shown that the factfinder failed to do so in his case. The juvenile court initially ruled on the trustworthiness of the confessions during the trial and admitted them into evidence, then took the matter under advisement and issued its ruling a few weeks later finding D.D. delinquent beyond a reasonable doubt. On our review of the record, the court appears to have taken great care in its dual role as evidentiary gatekeeper during the trial, and then as factfinder from the conclusion of trial until the day it made its ruling. The court had the full ability to consider the weight it wished to give to D.D.'s multiple confessions in reaching its ultimate determination, and we see no indication in the record that it improperly conflated the corroboration analysis with its factual consideration of whether D.D. was delinquent beyond a reasonable doubt based on these corroborated confessions.

¶49 Finally, D.D. asserts that, aside from these perceived errors on the part of the court, the State presented "insufficient evidence . . . to find D.D. delinquent without entertaining a reasonable doubt of his guilt." We disagree.

¶50 The State put on evidence of at least six confessions, with varying degrees of detail given in each. In the Initial Confessions, D.D. described in painstaking detail how he would enter Niece's room, make sure she was asleep, "bring her panties

down to her knees," "run his finger around her genitalia," and sometimes "touch[] the inside of her genitalia." And in the Police Station Confession, he gave similarly detailed admissions with respect to Niece, as well as describing how he had "inappropriately" "touched the tip of [Nephew's] penis" during a diaper change, when Brother and Sister-in-law "weren't looking." In the Vehicle Confession, he again admitted that "he had inappropriately touched his niece." In addition, the two Text Message Confessions contained several admissions that, when viewed in concert with the other confessions, further support a finding that the State met its evidentiary burden. Namely, D.D.'s statement in the First Text Message Confession, "If I would have known that all of this would have happened, I NEVER would have touched [Nephew] and [Niece] like that in the first place," followed by similarly contrite statements in the Second Text Message Confession acknowledging that he had inappropriately "touched" Niece and Nephew. Finally, none of the details given in any of the confessions conflict with one another, and there are several common threads throughout, including that the touchings of Niece occurred at night while she was asleep, his detailing the parts of her body he touched, and his general admissions in each confession that he had inappropriately touched Niece, Nephew, or both.

¶51 In sum, we cannot conclude that an adjudication of delinquency is "against the clear weight of the evidence," and we do not possess a "firm and definite conviction that a mistake has been made" in this case. *See In re J.H.*, 2012 UT App 195, ¶ 2 (cleaned up). Accordingly, we reject D.D.'s argument that there was insufficient evidence to support a finding that he was delinquent beyond a reasonable doubt on both charged counts.

CONCLUSION

¶52 The juvenile court did not erroneously apply *Mauchley* in deciding that all of D.D.'s confessions were sufficiently

trustworthy to be corroborated and admitted into evidence. And based on these corroborated confessions, as well as other evidence in the record, there is sufficient evidence to support a finding of delinquency beyond a reasonable doubt. Accordingly, we affirm the juvenile court's ruling.

————