2025 UT App 73

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRANDON LEE JACOBSEN,
Appellant.

Opinion
No. 20220103-CA
Filed May 22, 2025

Second District Court, Farmington Department
The Honorable David J. Williams
No. 201700833

Scott L. Wiggins, Attorney for Appellant

Derek E. Brown and Michael Gadd,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1      After the district court decided to admit his confession into
evidence, Brandon Lee Jacobsen entered a conditional guilty plea
to a charge of attempted sexual abuse of a child. He now appeals,
challenging the court's order admitting the confession and
arguing that the confession is not sufficiently trustworthy. We
reject Jacobsen's arguments and affirm his conviction.

BACKGROUND

¶2      In 2019, Jacobsen's wife was "really, really good friends"
with a co-worker (Mother) who was a single mother of several

children, including then-two-year-old Mary.[1] In an effort to help Mother manage the burden of single motherhood, Jacobsen's wife and teenage daughter would often babysit Mary at their house, "normally on the weekend." As a result, Mary became close to Jacobsen's family and eventually came to refer to Jacobsen as "Uncle," even though Jacobsen had no blood relation to Mary or her family. At least twice during the summer of 2019, Jacobsen and his family took Mary to Lagoon, a local amusement park, during her weekends with them.

¶3 In early 2020, however, Mother's relationship with Jacobsen and his family began to deteriorate. In January, Mother learned that Jacobsen had a criminal record; she "researched it" and discovered that Jacobsen was "on the sex offender registry." Indeed, Jacobsen had been convicted, in 1995, of attempted sexual abuse of a child; that case had been resolved by a guilty plea in which Jacobsen had acknowledged in writing that he understood that, because he had been charged with a felony crime, he had an array of applicable constitutional rights, including the right to be represented by an attorney.

¶4 In February 2020, when Mary was almost three years old and "potty training," she complained to Mother that "she was itchy and it was hurting." Mother took Mary to a doctor, who examined Mary and discovered that Mary had molluscum—a highly contagious rash—around her anal area, which apparently can be transmitted via "anal sex." The doctor asked Mother if Mary had experienced "sexual abuse." At that time, Mother was unaware of any such abuse. But soon thereafter, Mary and Mother were "playing babies" when Mary told Mother that "Uncle touched [her]" in her "peepee area." As Mary made the statement, she pointed to "[t]he doll's vagina." Soon after that, Mother notified police.

---

1. A pseudonym.

¶5     Mary was then interviewed at the Children's Justice Center (CJC) by a "full-time, professional" child interviewer. During the interview, however, Mary did not repeat the allegation she had made to Mother. When asked whether "something happen[ed] that [they] need[ed] to talk about" or something that Mary didn't "think was right," Mary replied, "Mm, no."

¶6     As part of the investigation, Jacobsen was interviewed by a police detective (Detective). After being provided with *Miranda* warnings, Jacobsen "elect[ed] to proceed with the interview." During the interview, Jacobsen denied that he had ever touched Mary inappropriately. Before the interview ended, Detective asked if Jacobsen would be "willing to do a polygraph" test, and Jacobsen agreed, later telling Detective that he wanted to "try to clear [his] name." The polygraph was then scheduled for a few weeks later.

¶7     On the day of the polygraph examination—which was a Friday—Jacobsen woke up and went to work at around 7:00 a.m. While at work, Jacobsen ate a banana and two sandwiches. Jacobsen arrived home at about 3:30 p.m., at which point he "took a shower and just sat on the bed and watched a little TV." Jacobsen then drove himself to the polygraph appointment, which was scheduled for 5:00 p.m. Jacobsen later stated that he had been hungry during the polygraph examination, but he did not share this sentiment with anyone at the time. Before beginning the polygraph, Jacobsen signed a consent form, which included a section entitled "Your Rights." That section informed Jacobsen that he had "the right to refuse to take the polygraph test," "the right to stop the test at anytime," and "the right to refuse to answer any individual question." The consent form also informed Jacobsen that the "polygraph examination may be monitored or recorded." During his time at the polygraph appointment, Jacobsen had access to a restroom and water. Jacobsen was also notified, again, of his *Miranda* rights; before the polygraph began, Jacobsen signed a form captioned "Advice of Rights" that contained the *Miranda* warnings, including that he had "the right

to remain silent," "the right to talk to a lawyer for advice before" any questions were put to him, and "the right to have a lawyer with [him] during questioning."

¶8     The examination was performed at the police station by a special agent (Agent) with the Federal Bureau of Investigation (FBI). Agent later testified that, per FBI policy, he was not allowed to "carry or wear a firearm during a polygraph or display [his] badge or handcuffs or anything like that," and that he did not do so on this occasion. Prior to beginning the interview, Agent asked Jacobsen some background questions for a "biographical data sheet." Jacobsen's answers to those questions established that he was forty-five years old, was married, was in good health, had graduated from high school and had some college education, and was employed. Jacobsen also stated that he had slept seven hours the previous night. He indicated that his only "psychiatric or psychological treatment" had been for "sex offender treatment rehabilitation" while he had been in prison for his prior offense. Jacobsen also told Agent that he had an "attraction toward young kids" and had "fantasies . . . about young girls."

¶9     Agent did not have polygraph questions prepared prior to meeting Jacobsen; instead, Agent and Jacobsen worked together to "build" a set of nine questions that Agent believed were "going to be fair to" Jacobsen. During the ensuing examination, which lasted between fifteen and thirty minutes, Agent asked Jacobsen only the nine questions that they had discussed beforehand. In Agent's view, Jacobsen appeared to give deceptive answers to some of the questions; Agent's interpretation of the examination results was later confirmed by Agent's supervisor. Agent did not record the actual polygraph examination, but he did record the question-and-answer session that followed the examination; that interview lasted about an hour.

¶10    In an effort to "let [Jacobsen] know that he did not do well on the exam," Agent told Jacobsen that he "absolutely kn[e]w there was some type of sexual contact that [Jacobsen] had with

[Mary]." At first, Jacobsen denied any wrongdoing, stating that he had "never intentionally touched [Mary] in any sexual way." Agent followed up, positing that, while he did not believe "it's something that [Jacobsen does] all the time," Jacobsen may have "put [himself] in a position that [he] shouldn't have been in." Eventually, after several iterations of Agent telling Jacobsen that he "believe[d]" Jacobsen was just "a guy who made a mistake," Jacobsen volunteered that he had "actually just remembered one time" the previous summer when Mary had been "at Lagoon" with him and his family. Jacobsen explained that he had been asked "to take [Mary] into the bathroom" and that he "had to wipe her." Jacobsen explained that "when [he] wiped her [his hand] could have gone deeper [than] she's used to," but that "there was toilet paper between her vagina and [his] hand." When asked, Jacobsen agreed that he "intentionally put [his] finger with the toilet paper in-between her vaginal lips." Agent then asked Jacobsen to trace his hand and mark which finger was used to touch Mary, and Jacobsen indicated that he had done so with his middle finger. Agent then asked Jacobsen, "Why did you do that?," and Jacobsen responded that he had "[p]robably rationalize[d] it by saying [he] was getting all . . . the pee out" but that he "probably most likely . . . just wanted to feel it."

¶11 At the end of the interview, Agent asked Jacobsen several questions about whether he felt like he had been "treated fairly" during the course of the examination and interview, whether he got "an opportunity to explain [him]self in [his] own words," whether the "questions . . . ha[d] been fair," and whether he "understood the process and everything [Agent] asked [him]." Jacobsen answered all of these questions in the affirmative.

¶12 At this point, Detective entered the room, and Agent recounted for Detective what Jacobsen had just told him: that Jacobsen had admitted to inserting his middle finger into Mary's vagina and that he had done so on purpose and "for sexual gratification." Jacobsen affirmed that Agent had "relate[d]" the story accurately to Detective. Detective then asked Jacobsen if he

would "be willing to write [Mother] a letter and . . . explain some of this to her," which Jacobsen agreed to do. In that letter, which was addressed to Mother, Jacobsen wrote the following:

> I'm sorry about what I did to [Mary]. It was when she was potty training and we took her to Lagoon. I was the one who took her to the bathroom and when I wiped her I put my middle finger in between the lips of her vagina. I'm sorry for what I put you and your children through[;] that was not my intent. I'm sorry that [Mary] was hurt. This is all on me and not on [my family] or anybody else.

After that, Jacobsen left the police station and drove himself home. Before he left, Detective suggested to Jacobsen that it might be wise for him to put his "affairs in order."

¶13 Jacobsen was subsequently arrested and charged with one count of aggravated sexual abuse of a child, a first-degree felony. As he was being arrested, Jacobsen recanted his confession, stating that he "didn't do anything wrong" and that he had just "wiped the two-year-old" who "was potty training." Detective explained to Jacobsen that his prior confession had been recorded, a fact that appeared to surprise Jacobsen.

¶14 Later, Jacobsen filed a motion asking the district court to bar the State from presenting, as evidence at trial, three items: (1) his confession, (2) the results of his polygraph examination, and (3) the statements Mary made to Mother about the incident. As relevant here, Jacobsen argued that his confession was untrustworthy, and should not be admitted into evidence, because "the State cannot corroborate it with other evidence" and because the confession was "induced by psychological manipulation that amounts to coercion." Regarding coercion, Jacobsen asserted that, if he had requested an attorney at the outset of the polygraph examination, he would have had to wait for one until after the weekend and would have needed to spend

the weekend in jail; that he had been hungry and tired; and that Agent "took advantage" of Jacobsen's mindset and "used minimization techniques," among other things.

¶15 The court then held a three-day evidentiary hearing regarding Jacobsen's motion. On the first day, the court heard testimony from Mary, Mother, Agent, Detective, and a physician who had examined Mary. Mother, Detective, and Agent all testified about the events described above. In addition, Agent testified about the interview techniques he employs generally and the specific techniques he employed in interviewing Jacobsen. In particular, Agent discussed Jacobsen's transition during the interview from an outright denial to finally describing in detail the Lagoon incident. Agent also clarified that at no point during the interview did he display a weapon, "use any misrepresentations," "threaten [Jacobsen] with physical abuse," or "give the implication that [Jacobsen] would be treated more leniently if he confessed."

¶16 On the second day, as relevant here, an expert on confessions (Expert) testified on Jacobsen's behalf. Expert testified about the prevalence of false confessions, methods of coercion, and ways in which coercion can result in a false confession. Expert also opined on the effects of "physical factors" such as being tired or hungry.

¶17 Jacobsen also testified. He discussed his experience with the polygraph examination. In particular, Jacobsen stated that he thought "there would be no audio or video recording of the session." He also stated that he was not "told that [he] could leave at any time," and that he was told he could leave only after the examination and interview. Jacobsen also denied any wrongdoing. While Jacobsen did admit to taking Mary to the restroom at Lagoon, he asserted that nothing untoward had occurred and that Mary "wiped" and then "got down and pulled up her panties" by herself. Jacobsen stated that he told Agent "that [he] had wiped her" only because Agent "wasn't going to

let [him] go home until he heard what he wanted to hear." Finally, Jacobsen testified that he had never had molluscum.

¶18 The district court took the matter under advisement, and it later issued a written ruling granting Jacobsen's motion in part and denying it in part. The court granted the motion with regard to Mary's statements to Mother and to the polygraph examination results, and it determined that those items of evidence would not be admitted at trial. With regard to Jacobsen's confession, however, the court denied the motion and ruled that the confession would be admitted into evidence at trial.

¶19 In determining whether the confession was sufficiently trustworthy, the court began its analysis by considering four factors: the presence of an attorney; the spontaneity of the statement; Jacobsen's physical and mental condition; and the presence (or absence) of deception, tricks, threats, or promises. The court noted that, while there was "no attorney . . . present during [Jacobsen's] confession," Jacobsen had known about the upcoming polygraph for "some time," had agreed to the polygraph, had been advised of his rights, and was "not unfamiliar with the criminal process." Accordingly, the court determined that this factor weighed "only slightly" "against trustworthiness." The court determined that the second factor—spontaneity—was neutral because, although the confession was "made as a result of persistent questioning," Jacobsen had provided the details of the incident completely on his own. The court found that Jacobsen's "positive physical and mental condition" weighed in favor of trustworthiness because of his age, education, and prior involvement with the criminal justice system. The court was unpersuaded by Jacobsen's argument that he had been tired and hungry, finding that he had had sufficient "opportunity" to resolve those issues before driving himself to the polygraph examination. Finally, the court found that there was a relative absence of deception or coercion because Agent never displayed a badge or firearm, the "entire meeting . . . lasted less

than three hours," and Agent's techniques were not "so inherently coercive as to overcome [Jacobsen's] will."

¶20 Subsequently, Jacobsen pled guilty to "an amended charge of attempted sexual abuse of a child, a third-degree felony." In entering that plea, however, Jacobsen reserved his right—pursuant to rule 11(j) of the Utah Rules of Criminal Procedure and *State v. Sery*, 758 P.2d 935 (Utah Ct. App. 1988)—to appeal the court's ruling regarding the admissibility of his confession.

## ISSUE AND STANDARD OF REVIEW

¶21 Jacobsen now exercises his reserved right to appeal the district court's determination that his "confession was sufficiently trustworthy to be admitted into evidence." A district court's determination regarding the trustworthiness of a confession "is a legal determination" that "we review for correctness." *In re D.D.*, 2021 UT App 100, ¶ 26, 500 P.3d 868.

## ANALYSIS

¶22 Jacobsen assigns error to the district court's determination that his confession, made during the interview following his polygraph examination, was sufficiently trustworthy to be admitted into evidence. In assessing Jacobsen's challenge, we begin with a discussion of the governing legal principles and caselaw, and then we transition into an evaluation of the totality of the circumstances at play here, including various factors identified by our supreme court. In the end, we discern no error in the district court's decision.

### A

¶23 Until 2003, Utah applied the "orthodox corpus delicti" rule to questions regarding the admissibility of a defendant's

extrajudicial confession. *See State v. Mauchley*, 2003 UT 10, ¶ 18, 67 P.3d 477; *see also In re D.D.*, 2021 UT App 100, ¶ 32, 500 P.3d 868. Under that rule, "an extrajudicial confession, by itself," was not considered "sufficient to sustain a conviction of a crime," and such a confession could not be admitted into evidence against the defendant "unless there [was] other corroborative evidence of the crime." *See Mauchley*, 2003 UT 10, ¶ 12 (cleaned up). Thus, if the only evidence indicating that the defendant had committed a crime was the defendant's own uncorroborated extrajudicial confession, the confession could not be admitted into evidence.

¶24 In *Mauchley*, however, our supreme court "joined the federal courts and a growing number of state courts in abandoning the [orthodox] corpus delicti rule in favor of [a] new version of the corroboration rule." *See In re D.D.*, 2021 UT App 100, ¶ 32 (cleaned up); *accord Mauchley*, 2003 UT 10, ¶¶ 19, 48. The new rule focuses on "corroboration of the confession itself rather than corroboration that a crime was committed." *In re D.D.*, 2021 UT App 100, ¶ 32 (cleaned up). In moving away from the orthodox corpus delicti rule, our supreme court noted that it was "not eliminating the corroboration rule," because it recognized that "the need still exists to prevent errors in convictions based upon untrue confessions alone." *Mauchley*, 2003 UT 10, ¶ 47 (cleaned up); *see also id.* ¶ 50 (stating that "the precept still stands that no defendant can be convicted solely on the basis of an uncorroborated out-of-court confession" (cleaned up)). The court referred to its new rule as "the trustworthiness standard," which asks courts to consider, under "the totality of the circumstances," "whether a defendant's confession is sufficiently trustworthy or reliable to be admitted into evidence." *Id.* ¶¶ 19, 47–48, 58.

¶25 Under this standard, "the State must introduce substantial independent evidence which would tend to establish the trustworthiness of the confession." *Id.* ¶ 50 (cleaned up). But to meet this standard, the State "need not necessarily [produce] independent evidence of the crime." *Id.* ¶ 51. Instead, the State may "establish the trustworthiness of the confession with other

evidence typically used to bolster the credibility and reliability of an out-of-court statement." *Id.* (cleaned up). And to assist courts in making this assessment, our supreme court listed some "factors" that "have applicability in determining the trustworthiness of confessions." *Id.* ¶ 52. For instance, courts may consider "evidence as to the spontaneity of the statement; the absence of deception, trick, threats, or promises to obtain the statement; the defendant's positive physical and mental condition, including age, education, and experience; and the presence of an attorney when the statement is given." *Id.*

¶26    This list of factors is not intended to be exhaustive, and the court emphasized that, as a general matter, "the overall facts and circumstances related in the confession must be consistent with facts otherwise known or established." *Id.* ¶ 53 (cleaned up). In particular, the court noted that "a demonstrably wrong statement may indicate that a confession is false," and the court offered this illustrative example: "[I]f a man spontaneously confesses that he fondled a child, but the evidence demonstrates he was never in physical proximity with the child, his confession is likely untrustworthy because the facts related in the confession are inconsistent with otherwise known or established facts." *Id.*

¶27    Several years later, in *In re D.D.*, 2021 UT App 100, 500 P.3d 868, we applied the trustworthiness standard in a case involving a juvenile who confessed, in several different communications, to sexually touching his niece and nephew. In that case, we determined that the confessions at issue were sufficiently trustworthy to be admitted, even though the confessor was a juvenile, had mental health issues, was "on the autism spectrum," and had at one point previously been determined to be incompetent to stand trial. *Id.* ¶¶ 2, 16. In making our decision, we considered the four listed *Mauchley* factors: "spontaneity of the statement; the absence of deception . . . ; the defendant's positive physical and mental condition . . . ; and the presence of an attorney when the statement [was] given." *Id.* ¶ 33 (cleaned up).

¶28    In considering spontaneity, we noted that "spontaneous" is a word that "can take on subtly different definitions, depending on how the word is used." *Id.* ¶ 35. In one sense, "spontaneous" means "something developing or occurring without apparent external influence, . . . or arising from a momentary impulse." *Id.* (cleaned up). But in another sense, "spontaneous" can mean "controlled and directed internally" and "not apparently contrived or manipulated." *Id.* ¶ 36 (cleaned up). Applying these definitions, we determined that the juvenile's confessions in response to police questioning met this second definition of spontaneity—even though the "questions posed" by the officers "were the stimuli that got [the juvenile] talking"—because the juvenile "volunteered . . . detailed information . . . without any cajoling." *Id.* We further determined that there was a lack of deception or trickery on the part of police, in part because the juvenile confessed following "very straightforward, open-ended" questioning to which he "responded with lengthy narratives and explanations." *Id.* ¶ 38. We also observed that "there [was] no indication that [the juvenile's] mental disorder affected the trustworthiness of his confessions." *Id.* ¶ 40. Finally, we noted that the confessions were "consistent with facts otherwise known or established," including the undisputed fact that the juvenile "was repeatedly in physical proximity with the children during the times that he stated the touchings occurred." *Id.* ¶¶ 42–43 (cleaned up). Accordingly, we determined that the juvenile court had not erred by deeming the confessions trustworthy and by admitting them into evidence. *Id.* ¶ 44.

B

¶29    With this legal background in mind, we now turn to an examination of the circumstances presented here. As we did in *In re D.D.*, we begin with the *Mauchley* factors, and we then consider whether the "overall facts and circumstances related in the confession are consistent with facts otherwise known or established." *Id.* ¶¶ 33–43 (cleaned up). After considering the

totality of the circumstances, we discern no error in the district court's decision to admit the confession.

¶30    In this case, two of the four *Mauchley* factors clearly weigh in favor of admission of Jacobsen's confession. First, an examination of Jacobsen's "positive physical and mental condition, including age, education, and experience," leaves us with no reservations about Jacobsen's capacity to understand the situation. *See id.* ¶ 33 (cleaned up). As noted, at the time of the confession, Jacobsen was a healthy, intelligent, forty-five-year-old adult who had previous experience in the criminal justice system. By contrast, the confessor in *In re D.D.* was a juvenile with mental health issues, and we nevertheless found that this factor "weigh[ed] in favor of corroborating [the] confessions." *Id.* ¶ 41. Indeed, Jacobsen does not appear to contest that this factor weighs in favor of admission here. Accordingly, we conclude that this factor clearly weighs in favor of admission.

¶31    Second, as in *In re D.D.*, there is little indication of any deception or trickery on the part of the individuals who elicited the confession. *See id.* ¶ 38. In this case, the questioning was not aggressive, and Agent did not misrepresent any facts to Jacobsen. There is no indication that Agent made any promises or threats to Jacobsen. And at the end of the interview, Jacobsen even affirmed that he felt that he had been "treated fairly" and had the "opportunity" to explain the events "in [his] own words."

¶32    Jacobsen pushes back by pointing to two things: (1) Agent's statement, at the conclusion of the polygraph examination, that he "kn[e]w that there was some type of sexual contact" between Jacobsen and Mary; and (2) Detective's request that Jacobsen write a letter of apology to Mother. But we do not view Agent's statement about the polygraph results as deceptive or tricky, because Agent's statement appears to reflect his good-faith belief that Jacobsen gave answers during that examination that appeared to indicate untruthfulness; indeed, the results of the test were later confirmed by Agent's supervisor. At a minimum,

Jacobsen points to no evidence that the test results were inaccurate, or even that Agent was misrepresenting the results to Jacobsen by making the statement. And Jacobsen's argument that Agent's reference to the polygraph results was "deceptive" because such results are inadmissible at trial is not a convincing one, chiefly because Agent did not ever represent to Jacobsen that the test results would be admissible. As for Detective's request that Jacobsen write an apology letter to Mother, we note simply that this request was not made until *after* Jacobsen had already confessed, so such a request has no bearing on the trustworthiness of the confession itself.

¶33    Thus, we discern no deception or trickery on the part of Agent or Detective, and we therefore conclude that the "deception or trickery" factor weighs in favor of admission.

¶34    The other two *Mauchley* factors, however, are closer calls on the facts of this case. Jacobsen did not have an attorney present when the confession was given, and for this reason the district court correctly concluded that the "presence-of-an-attorney" factor must be weighed against admission. But we agree with the court's assessment that this factor should be weighed "only slightly" against the State under the circumstances. Here, in an effort to "try to clear [his] name," Jacobsen chose to voluntarily submit to a polygraph examination. He worked out a time and date that was convenient for him, eventually arranging a date that gave him several weeks to prepare for the examination. On the day of the examination, he drove himself to the police station after completing his workday and relaxing for an hour watching TV. Once at the station, Jacobsen voluntarily signed a document indicating that he was aware that he had the right to an attorney and that he was willing to waive his *Miranda* rights, and he signed another document indicating that he was aware that he had the right to stop the test or to refuse to answer any particular question. And given his previous experience with the criminal justice system, Jacobsen can be expected to have had a fulsome understanding of these documents; indeed, during his previous

case, Jacobsen entered a guilty plea and, in the process, specifically acknowledged that, as a defendant, he had an array of applicable constitutional rights, including the right to be represented by an attorney. While none of these things, either individually or taken together, can adequately substitute for the presence of counsel, we agree with the district court's assessment that they contribute toward mitigation of any concerns about Jacobsen not having counsel present during the confession. We therefore agree with the court's conclusion that this factor should weigh only slightly against admission of Jacobsen's confession.

¶35   Finally, we consider the spontaneity of Jacobsen's confession. Here, where the confession was given in response to police questioning but where Jacobsen freely volunteered the relevant (and incriminating) details of the incident in question, the confession is similar to the one analyzed in *In re D.D.* In that case, we concluded that the confession met one definition of "spontaneous" (it was "controlled and directed internally" by the confessor and was "not apparently contrived or manipulated") but did not meet another (it did not "develop[] or occur[] without apparent external influence"). *Id.* ¶¶ 35–36 (cleaned up). Under those circumstances, we concluded that the "spontaneity" factor "yield[ed] more nuanced results." *Id.* ¶ 36.

¶36   We reach the same conclusion here. To be sure, Jacobsen's confession was the result of police questioning, and in that sense it cannot be said to have been spontaneously offered. But in another sense, Jacobsen's confession—or, at least, the incriminating details contained within it—can be viewed as spontaneously offered because Jacobsen freely volunteered those details in response to open-ended questions and without any cajoling or suggestion from Agent. In particular, Jacobsen not only admitted to inappropriate contact with Mary, but he volunteered that the incident happened in a restroom at Lagoon while he was helping Mary use the restroom. And in response to an open-ended question from Agent ("Why did you do that?"), Jacobsen stated that he had "[p]robably rationalize[d] it" by telling himself

he was only helping Mary wipe after using the restroom, but that he "probably most likely . . . just wanted to feel it." Under these circumstances, the spontaneity factor yields "nuanced results," *see id.*, and does not weigh meaningfully in either direction.

¶37    Thus, two of the *Mauchley* factors rather clearly favor admission, one weighs slightly against admission, and one does not tip the scales significantly in either direction.

¶38    Next, we consider whether "the overall facts and circumstances" that Jacobsen "related" in his confession are "consistent with facts otherwise known or established." *See id.* ¶ 42. In this case, it is undisputed that Mary spent significant time at Jacobsen's house and that Mary had developed a relationship with Jacobsen and his family. Indeed, even after recanting his confession, Jacobsen testified that he and his family had taken Mary to Lagoon, and he even acknowledged that he had taken Mary to the restroom at Lagoon. Therefore, unlike the *Mauchley* hypothetical in which a man confesses to "fondl[ing] a child" despite "evidence demonstrat[ing] he was never in physical proximity with the child," *see* 2003 UT 10, ¶ 53, 67 P.3d 477, the facts here readily show that Jacobsen had the opportunity to commit the precise crime to which he confessed.

¶39    Jacobsen, however, directs our attention to two facts that, in his view, indicate that his confession is inconsistent with the known or established facts of the case. First, Jacobsen points to the CJC interview in which Mary did not repeat the allegations of abuse that she had previously made to Mother. And second, he reminds us that there is no evidence that he (as opposed to Mary) ever had molluscum. But these facts are not necessarily inconsistent with Jacobsen's confession. With regard to the CJC interview, Mary certainly didn't *recant* the allegations she had previously made. She just didn't repeat them. The fact that a three-year-old said nothing of value during an interview in a new place with a stranger does little to render Jacobsen's confession

inconsistent with known facts.[2] And as for the molluscum, that rash was discovered on Mary several months after the confessed abuse took place; the fact that Mary had molluscum in February 2020 but Jacobsen did not (and apparently never had) is not at all inconsistent with the facts of the confessed abuse.

¶40    Thus, after considering the totality of the circumstances, including the *Mauchley* factors and the facts Jacobsen urges us to consider, we discern no error in the district court's conclusion that Jacobsen's confession is sufficiently trustworthy to be admitted into evidence in a trial in this case.

## CONCLUSION

¶41    For all the foregoing reasons, the district court did not err in deeming Jacobsen's confession sufficiently trustworthy for admission. Accordingly, we reject Jacobsen's challenge to the district court's order and affirm his conviction.

———————

2. The State points out that Jacobsen's confession is entirely consistent with Mother's account that Mary told her that Jacobsen abused her, and it asks us to consider that evidence in assessing whether Jacobsen's confession is consistent with other known facts. We decline this invitation, however, both because the question of whether an otherwise-inadmissible statement can be considered when evaluating the trustworthiness of a confession has not been decided in Utah, and because the other known facts of the case are largely consistent with Jacobsen's confession.